690 A.2d 1192

**In re Byrae Lafay GRIFFIN, a/k/a Byrae Lafay Jeffrey and Byron Todd Griffin, a/k/a Byron Todd Jeffrey.**

**Appeal of Michael and Karen DERZACK.**

Superior Court of Pennsylvania.

Argued Oct. 31, 1996.

Filed Feb. 19, 1997.

442

444

Georgene Siroky, Pittsburgh, for appellees.

Jon S. Pushinsky, Pittsburgh, for appellants.

Wendy Vaupel, Pittsburgh, for Allegheny County Children and Youth Services, participating party.

Before TAMILIA, JOHNSON and BROSKY, JJ.

TAMILIA, Judge.

Michael and Karen Derzack appeal from the January 17, 1996 Order entered by Juvenile Court sitting en banc.[1] The Order, which followed the latter of two contempt hearings, removed Byrae and Byron Griffin from the physical custody of appellants and granted Allegheny County Children and Youth Services (hereinafter "CYS") permission to place the children in alternative adoptive foster care. The court en banc ordered removal after finding that appellants had violated no less than eight Orders of court concerning the care and custody of the Griffin children. The facts relevant to this appeal are set forth by Juvenile Court as follows, with the Orders deemed violated by appellants indicated in bold.

Byrae was born drug-addicted, on July 30, 1991, to La-Shawn Jeffrey (hereinafter, "Mother") and Todd Griffin. Approximately one year later, on July 15, 1992, Byron was born drug-addicted to the same parents. On November 30, 1992, four months after Byron's birth, Todd Griffin died in an automobile accident. Byron and Byrae have three older siblings (brothers) who are the natural children of Mother, but have different fathers. Byron is the youngest of Mother's five children.

Byrae first came to the attention of this Court in November 1991. Byrae, then three months of age, drug-addicted

1. The court en banc consisted of the Honorable Joseph A. Jaffe, the Honorable Max Baer and the Honorable Cheryl Allen Craig. We note that nothing in the procedural statutes governing the conduct of Juvenile Court hearings provides for an en banc proceeding. However, although appellants filed a Motion to Strike the Court En Banc, R. 429b, they have not appealed from the denial of that motion. Accordingly, any challenge to the propriety of the en banc proceeding was not preserved and is not at issue in this appeal.

and weighing only seven pounds, six ounces, was removed from Mother's care and taken by paramedics to Children's Hospital where she was diagnosed as suffering from severe malnutrition, dehydration and a severe skin infection. Children's Hospital reported Byrae to be "near death" when admitted.

Following a hospitalization of one week, the matter of Byrae and her three older siblings was brought before this Court pursuant to a Petition for Dependency filed by CYS. On November 21, 1991, Byrae and her three older brothers were adjudicated dependent. Her older siblings were present in Court and were removed that day by CYS from Mother's custody with Mother's consent, pursuant to Mother's acknowledgement that she was unable to care for her children because of a chronic drug dependency. Upon her discharge from Children's Hospital, Byrae was placed by CYS into the care and custody of her paternal grandmother, Flora Griffin Shapiro. Byrae remained in the home of Flora Griffin Shapiro for the next eighteen months.

Between the period of November 1991 to July 15, 1992, this Court held several hearings regarding the welfare of Mother's children wherein evidence of the severe nature and extent of the neglect suffered by Byrae and her older siblings was placed on the record. Based upon the serious nature of the information contained in the record, Byron's special health needs at birth as a result of his drug-addiction and Mother's abandonment of Byron when she failed to return to the hospital to take him home following his birth, CYS immediately filed a Petition for Dependency, with respect to Byron, within days of his birth. This Court entered an Order on July 27, 1992 adjudicating Byron a dependent child. For purposes of placement, Byron was designated a "child in need of special care".

Initially, CYS sought placement of Byron with relatives. When efforts to place him with relatives failed, CYS selected and approved the Derzacks, a foster care family with Family Services of Western Pennsylvania (hereinafter, "Family Services"), as a special needs foster care family, for

the singular purpose of accepting placement of Byron for a temporary period of time after his discharge from the hospital. The original understanding between CYS and the Derzacks was that Byron was being placed with the Derzacks for a few days, pending the outcome of CYS' Petition for Dependency which had been filed on Byron's behalf. Byron was placed with the Derzacks on July 21, 1992. On the date of his first placement, Byron was six days old[.]

Following the dependency adjudication, CYS returned Byron to the Derzacks' home while an adoption plan was being developed. Byron's original adoption plan was being developed under a new CYS policy which had been adopted on May 15, 1992 by CYS and captioned, "Child and Youth Services Transracial Placement Policy" (hereinafter "transracial placement policy"). The transracial placement policy was an internal policy which grew out of a national concern for African–American children being displaced in white adoptive homes and the impact of such placement on their lives.... Although Byron and the Derzacks' case fell under CYS' transracial adoption policy, Byron's status in the Derzacks' home remained uninterrupted for five months while CYS completed his adoption plan and identified an African–American pre-adoptive home.

By letter dated December 15, 1992, CYS advised the Derzacks that a pre-adoptive home had been found for Byron and that a representative of CYS would arrive at the Derzacks' home on December 16, 1992 to take him away. The Derzacks responded to CYS' letter by notifying the news media to come to their home to film their planned confrontation with CYS. When CYS arrived at the Derzacks' home, the Derzacks, in the presence of reporters representing the news media, refused to hand Byron over to CYS. To avoid a confrontation with the Derzacks and trauma to Byron, CYS left Byron in the Derzacks' home and petitioned the Court that day for an immediate hearing to resolve the impasse. A hearing on CYS' petition was held before this Court on the following day, December 17, 1992.

At the hearing held December 17, 1992, this Court specifically addressed CYS' internal transracial placement policy and determined that CYS' selection of an African–American pre-adoptive home for Byron, solely on the basis of color, was not in the best interest of the child. Consequently, this Court overruled CYS' internal transracial placement policy and entered an Order continuing Byron's placement with the Derzacks. This Court further ordered CYS to assist the Derzacks in adopting Byron, thus rendering moot, the issue of transracial adoption with respect to the Derzacks, this Court having found in favor of the Derzacks when Byron was returned to them, for the purpose of adoption, in December 1992.

With the exception of giving birth to Byron on July 15, 1992, Mother remained absent from and uninvolved in the rearing of Byron and Byrae from November 1991 until January 1993. On or about January 1993, Mother visited with Byrae, who was then living with her paternal grandmother, and attempted to reestablish a mother-child relationship with Byrae, for the first time since the child's dependency adjudication in November 1991. No attempt was made by Mother to visit with Byron, at this time. The Court, therefore, returned Byron to the Derzacks, following a review hearing held on March 12, 1993. Dr. Patricia Piercy was appointed to conduct psychological evaluations of Byron and to monitor and evaluate his adjustment to living with the Derzack family.

In late March 1993, Mother contacted CYS and, for the first time since his birth, requested to visit with Byron. Although still drug dependent, Mother advised CYS that she had completed a twenty-eight day program in Meadville, Pennsylvania and desired to find placement in a longer term drug rehabilitation program with the hope that she could eventually regain custody of her children. Subsequently, Mother was accepted into an inpatient drug rehabilitation program at the Sojourner House in Pittsburgh, Pennsylvania. Her official entry date into the program was April 6, 1993.

Based upon Mother's success at Sojourner House, this Court entered an Order on June 25, 1993 reuniting Mother and Byrae. Byrae was removed from the home of her paternal grandmother and sent to live with Mother at Sojourner House. On December 20, 1993, based upon progress shown in Mother's treatment in her drug rehabilitation program and her desire to be reunited with her youngest child, this Court ordered that Byron be sent to live with Mother and Byrae at Sojourner House. The Order included a stipulation that in the event that Byron needed "respite, shelter or temporary care", the Derzacks should provide it.

On December 21, 1993, the Derzacks issued a news release criticizing Mother. After the news release, the Derzacks contacted the news media and invited them to to [sic] be in attendance at their home to film and report Byron's removal. Even though CYS attempted to avoid additional media exposure to Byron by changing the removal date from December 28th to December 27th, the Derzacks were successful in creating another media spectacle of the event. In spite of the media spectacle, Byron was removed from the Derzacks' home on December 27, 1993, pursuant to this Court's Order of December 20, 1993.

On January 24, 1994, this Court issued an Order prohibiting the discussion of Byron in public by anyone involved in any capacity with Byron's care and granted the Derzacks permission to visit with Byron four hours a month. This Court was advised on or about February 1994 that the Derzacks had ignored the January 24, 1994 court Order and had hired a writer with whom they intended to co-write a book about Byron entitled, "Bird Without Feathers". "Bird Without Feathers" was subsequently written and published.

Mother, Byrae and Byron lived together at Sojourner House until April 1994. In April 1994, Mother was released from Sojourner House and entered a relapse prevention program known as the Penn Free Program with Byron and Byrae. The Penn Free Program is designed to assist chemically dependent individuals in making the transition

from a structured rehabilitation program to independent living in the community. On April 20, 1994, the Derzacks' visitation privileges, as to Byron, were terminated when Michael Derzack spoke to the media in violation of this Court's January 1994 Order prohibiting the discussion of Byron in public. In spite of the Court's termination of their visitation privileges, the Derzacks continued to place Byron's case before the public, in complete disregard for the Order of Court prohibiting such behavior.

In spite of the intensive assistance provided by the Penn Free Program and the Right Start Program, an in-home parenting service provided to Mother four days a week by CYS, Mother renewed her drug use in June 1994.

On June 28, 1994, Byron and Byrae were removed from the custody and care of Mother when the Court received evidence that Mother was again using crack cocaine. By Order of Court, as a temporary measure until further order of court, Byron and Byrae were placed with their older siblings in the home of their maternal great aunt, Marion Ellis. This was the third placement family for both Byron and Byrae.

On July 5, 1994, this Court reviewed Byron's and Byrae's temporary placement with Marion Ellis. At this hearing, the Court ordered the continued temporary placement of Byron and Byrae with Marion Ellis and interactional and developmental evaluations of Mother and all of her five children. Mother was also granted unlimited supervised visits with Byron and Byrae based upon her renewed active participation in the Penn Free Program. In spite of the efforts of the Court and CYS to assist Mother in every way possible to maintain a relationship with Byron and Byrae, Mother resumed her drug use within two weeks of issuance of the July 5, 1994 Order of Court. Consequently, this Court granted a Petition to Intervene filed by the Derzacks and directed CYS to file a petition to terminate Mother's parental right as to Byron and Byrae within ninety days. Interactional and developmental evaluations of Marion Ellis, the Derzacks, Byron and Byrae were ordered by the Court.

Byron and Byrae remained in the care and custody of Marion Ellis until October 6, 1994. During the time that Byron lived with Marion Ellis, he continued to visit with the Derzacks. Based upon the recommendations set forth in the interactional and developmental evaluations and upon Marion Ellis' health and surrogate responsibilities with regard to Mother's three older children, this Court determined that it was in the best interest of Byron and Byrae to be placed with the Derzacks for the purpose of adoption.

In preparation for what was hoped to be Byron and Byrae's last placement into the care and custody of the Derzacks to await completion of the Derzacks' adoption plan, this court entered an Order on **October 5, 1994** which incorporated dependency restrictions and foster care regulations. The dependency restrictions and foster care regulations clearly stated that written consent from CYS or an Order of Court was needed for the Derzacks to travel outside of Allegheny County with Byron and Byrae. This Order was later ignored by the Derzacks when they travelled with Byron and Byrae to California and New York to tape several nationally televised talk shows discussing the children without written consent from CYS or this Court.

On **October 6, 1994,** this Court ordered that both Byron and Byrae be immediately placed with the Derzacks as an adoptive foster care placement and, *inter alia,* that supervised visitation privileges be granted to Byron and Byrae's Mother, paternal grandmother and three older siblings. Two weeks later, on October 20, 1994, the Derzacks appeared on The Maury Povich Show, a nationally televised talk show, discussing Byron and his case, in violation of this Court's Order of January 24, 1994. In response, the child advocate representing the interests of Byron and Byrae petitioned this Court to find the Derzacks in contempt of court for violation of its Order of January 24, 1994. On **November 14, 1994,** this Court entered a second Order prohibiting all parties from exposing Byron and Byrae to the public vis-a-vis discussions or references.

On **April 12, 1995,** this Court heard CYS' petition to involuntarily terminate Mother's parental rights and entered supplemental orders which modified this Court's October 6, 1994 Order by (1) granting visitation rights to additional relatives of Byron and Byrae, (2) providing a time certain for Byron and Byrae's great aunt, paternal grandmother and siblings to visit with the children and (3) reaffirming its November 14, 1994 Order that all parties refrain from public discussion or reference to the children.

At the Derzacks' contempt hearing held December 13, 1995 before the court en banc, Timothy Jashinski, an adoption caseworker for CYS, testified that the Derzacks initially permitted Byron's and Byrae's great aunt, paternal grandmother and siblings to visit the children upon request for several months, in compliance with this Court's Orders. Then, shortly after learning of CYS' petition for termination of the parental rights of Mother, the Derzacks began to refuse to allow Byron and Byrae to visits with their relatives and siblings unless they (the Derzacks) were permitted to be a part of the visits. Timothy Jashinski testified that the Derzacks unilaterally terminated Byron and Byrae's visits with their relatives and siblings, in August 1995, stating to CYS that their attorney had told them that they had been "granted" or "appointed" in loco parentis. Although, it is unclear whether the Derzacks understood the legal meaning of in loco parentis, they repeatedly used the term to justify their refusal to obey any and all Court Orders issued after April 1995.

On **May 9, 1995,** this Court entered an Order directing CYS to comply with this Court's Order of October 6, 1994, with respect to family member visitations with the children. The Order of May 9, 1995 further directed CYS to arrange for professional therapeutic intervention, consultations and evaluation of Byron and Byrae. Additionally, the CYS caseworker was ordered to make announced and unannounced visits at the home of the Derzacks. In May 1995, Dr. Debra Klosterman, was under contract with CYS to observe Byron and Byrae's interactions with the Derzacks

and with their relatives and siblings during scheduled visits. The Derzacks, however, failed or refused to schedule visits with Dr. Klosterman and Byron and Byrae until after the Contempt hearing held on December 13, 1995.

[On **July 14, 1995,** an Order was entered requiring the Derzacks to correct their adoption/foster care application and adoption petition to reflect appellant/wife's previous psychiatric history and to provide proof of appellants' annual income for the previous five years.]

On **August 14, 1995,** this Court found that it was in the best interest of Byron and Byrae to visit with their siblings and their paternal grandmother and ordered that the siblings and paternal grandmother visit with Byron and Byrae every week, free of observation, attendance or participation of the Derzacks until further Order of Court. The Order of November 14, 1994, prohibiting all parties from exposing Byron and Byrae to the public vis-a-vis discussions or references, was to remain in full force and effect.

In spite of the Orders of October 5, 1994, prohibiting travel outside of Allegheny County without the consent of CYS or the Court, the Derzacks travelled to New York with Byron and Byrae to appear on the Montel Williams talk show on October 16, 1995 and, as part of their interview, mentioned over national television the children's names and discussed the circumstances surrounding the children being in their care. Since October 16, 1995, the Derzacks have appeared on the following nationally televised talk shows discussing Byron, Byrae and/or their legal and personal efforts to gain custody of the children: Sally Jesse Raphael Show, the Leeza Gibbons Show and the Rikki Lake Show. This Court takes judicial notice of Byron and Byrae's appearance "on camera" on at least three of the televised talk shows and of the appearance of their names and photographs in numerous newspaper articles. The unauthorized travel to appear on talk shows and the intentional exposure of Byron and Byrae to the media, for the purpose of discussion of this case, was in violation of this Court's

Orders of October 6, 1994, November 14, 1994, April 12, 1995 and August 14, 1995.

[On **October 13, 1995,** an Order was entered requiring the Derzacks to permit announced and unannounced visits with the children by CYS caseworkers.] On October 27, 1995, [CYS caseworker] Timothy Jashinski made an announced, pre-scheduled visit to the home of the Derzacks and was prevented by Karen Derzack from speaking privately with Byron and Byrae and observing their physical condition up close. According to Timothy Jashinski's testimony, Karen Derzack placed Byron and Byrae at the top of the stairs while he remained at the bottom of the stairs, believing that he was not permitted to go up the stairs. After asking Byron and Byrae two or three general questions, Karen Derzack abruptly terminated Timothy Jashinski's visit with the children by telling him that "the questions will stop".

In November 1995, this Court was advised by the child advocate representing Byron and Byrae, that based upon information contained in a federal lawsuit for workers compensation filed by Karen Derzack in August 1994, Karen Derzack had failed to properly answer a question on the Derzacks' foster care application which concerned past treatment for a mental illness. This same question was also improperly answered on the Derzacks' application for adoption. The Court was further advised that the Derzacks had falsely represented their income on either their IRS tax returns or their adoption application or both, as these two documents reflected a significant discrepancy of tens of thousands of dollars per year in the Derzacks' reported annual income from 1990 to 1993.

On December 12, 1995, one day before the instant Contempt hearing, the Derzacks filed for personal bankruptcy claiming debts in excess of $540,000.00. The Derzacks stated that their legal expenses had forced them into bankruptcy.

(Slip Op., Craig, J., 5/10/96, pp. 2–13; emphasis added.)

Hearings on CYS' petition and amended petitions for contempt were held on December 13, 1995 and January 17, 1996.

At the conclusion of the latter hearing, the court adjudicated appellants in contempt of the eight Orders of court indicated above in bold, and directed CYS to immediately remove Byron and Byrae for the purpose of placing them with another pre-adoptive foster family. This appeal followed.

■ Before turning to the substance of appellants' claims, we must first address three procedural issues. Initially, appellants claim Juvenile Court lacked jurisdiction "to alter the placement of two dependent children when the placement Order was the subject of two pending appeals before the Superior Court." (Appellants' brief at 4.) The "two pending appeals" referred to by appellants were the appeal by La-Shawn Jeffrey from the April 12, 1995 Order terminating her parental rights,[2] and the appeal of Marion Ellis from the October 6, 1994 Order returning the children to appellants' home.[3] Appellants' brief argument on this point is premised on Pa.R.A.P. 1701, which provides as follows:

### Rule 1701. Effect of Appeal Generally

(a) General rule. [A]fter an appeal is taken ... the trial court or other government unit may no longer proceed further in the matter.

We reject appellants' claim that Rule 1701 ousted the jurisdiction of Juvenile Court to conduct the contempt hearings at issue. Initially, appellants' argument overlooks subsection (c) of Rule 1701, which provides:

### Rule 1701. Effect of Appeal Generally

(c) **Limited to matters in dispute.**—Where only a particular item, claim or assessment adjudged in the matter is involved in an appeal, or in a petition for review proceeding relating to a quasijudicial order, the appeal or petition for review proceeding shall operate to prevent the trial court or other government unit from proceeding further with only such item, claim or assessment....

**2.** Ms. Jeffrey's appeal was denied on June 3, 1996. *In re: Byron Jeffrey and Byrae Griffin,* 01862 Pittsburgh, 1994.

**3.** Ms. Ellis' appeal was denied on May 13, 1996. *In re: Byron Griffin,* 02052 Pittsburgh, 1994.

Since the appeals pending at the time of the instant contempt hearings related only to the termination of LaShawn Jeffrey's parental rights and removal of the children from the physical custody of Marion Ellis, they did not prevent Juvenile Court from considering whether appellants had violated the Order regarding their custody of the children. Simply put, the Orders challenged in the pending appeals were neither relevant to nor at issue in the contempt proceedings. Thus, each pending appeal raised a "particular item [or] claim" and Juvenile Court was precluded from proceeding "with only such item [or] claim[.]" On this basis, we find that Juvenile Court retained jurisdiction over all issues relating to the contemptuous conduct of appellants. A review of Juvenile Court's statutory authority further supports this conclusion.

The Juvenile Act, 42 Pa.C.S. § 6301 et seq., clearly vests in Juvenile Court a broad and continuing power to adjudicate in the best interests of dependent children. For instance, 42 Pa.C.S. § 6351(a) provides in relevant part:

### § 6351. Disposition of dependent child

(a) **General rule.**—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

*Id.* In *In re Tameka M.*, 525 Pa. 348, 580 A.2d 750 (1990), our Supreme Court construed section 6351 as follows:

The Juvenile Court maintains a continuing plenary jurisdiction in dependency cases under 42 Pa.C.S.A. § 6351 . . . and has the power to review the circumstances of dependent juveniles and to question both the legal custodian, CYS, and the foster parents concerning the condition and the needs of the dependent child.

. . .

[Instantly], Juvenile Court acquired continuing jurisdiction under section 6351(a)(2) once that court found Tameka M. to be a dependent child.

*Id.* at 351–352, 580 A.2d at 752 (emphasis added). Similarly, we find that Juvenile Court acquired continuing jurisdiction under section 6351(a) when it adjudicated Byron and Byrae Griffin dependent.

Were we to accept appellants' argument that Juvenile Court is deprived of jurisdiction once an appeal of any aspect of a dependency action is filed, we would render the court powerless to prevent any abuse, no matter how egregious, of a dependent child at the hands of his custodian. Most dependency actions, and especially those as prolonged as the one currently at issue, involve a variety of issues, parties and Orders of court. A holding that deprives Juvenile Court of jurisdiction merely because a single Order, involving any issue or party, has been appealed would not only defy logic, but it would also frustrate the statutory authority of Juvenile Court to exercise continuing independent and original authority to adjudicate in the best interests of a dependent child. See *In re Lowry*, 506 Pa. 121, 127, 484 A.2d 383, 386 (1984) ("[Juve-

nile Court] acts pursuant to a separate discretionary role with a purpose of meeting the child's best interests.").

■ Secondly, appellees claim appellants lack standing to pursue the instant appeal. They base this claim on our recent en banc decision in *In the Interest of G.C.*, 449 Pa.Super. 258, 673 A.2d 932 (1996). In *G.C.*, this Court held:

[B]ecause foster parents have neither permanent custody of their foster children nor an expectation of permanent custody, the decision of a legal custodian regarding custody does not cause the type of direct and substantial injury necessary for standing.

*Id.* at 272, 673 A.2d at 939. According to appellees, since appellants are foster parents, *G.C.* deprives them of standing to challenge Juvenile Court's removal Order.

Initially, we note that while seven of eight judges in *G.C.* agreed that a remand for further proceedings was necessary, the Court split evenly on the issue of standing. Thus, while the Opinion operated to affirm the trial court's determination of standing, it has no precedential authority. See *Chesler v. Govt. Employees Ins. Co.*, 302 Pa.Super. 356, 360, 448 A.2d 1080, 1082 (1982) (recognizing that a split decision "carries no weight as precedent."). Of course, the split decision in *G.C.* also left standing existing law, which had repeatedly denied standing to foster parents in a variety of circumstances. See e.g., *In re: Adoption of S.C.P.*, 364 Pa.Super. 257, 527 A.2d 1052 (1987) (foster parents lack standing to pursue custody of former foster children); *Priester v. Fayette County Children and Youth Services (CYS)*, 354 Pa.Super. 562, 512 A.2d 683 (1986) (foster parents lack standing to seek custody of foster child removed from their home); *In re Adoption of Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146 (1984) (foster parents lack standing to file for termination of parental rights). However, the facts of this case are somewhat different from those in which foster parents traditionally have been denied standing.

Specifically, although appellants were designated as foster parents at the time of Byron's initial placement on July 21,

1992, it is clear that their status ultimately changed. At least as early as December 17, 1992, when Juvenile Court directed CYS to assist appellants in adopting Byron, appellants were considered prospective adoptive parents. The court's Order of July 14, 1995 also indicates:

> "This court, at this time, is satisfied that [appellants] are appropriate prospective adoptive parents[.]

(Order, 7/14/95, R. 372b.) See also Slip Op. at 1 ("Karen and Michael Derzack [are] the proposed adoptive parents of Byron Todd Griffin ... and his sister, Byrae Lafay Griffin[.]").

On the issue of standing, this change in appellants' designation is critical. As this Court explained in *Mitch v. Bucks County Children and Youth Social Service Agency*, 383 Pa.Super. 42, 556 A.2d 419 (1989):

> [P]rospective adoptive parents, unlike foster parents, have an expectation of permanent custody which, though it may be contingent upon the agency's ultimate approval, is nevertheless genuine and reasonable. Because of this expectation of permanency, prospective adoptive parents are encouraged to form emotional bonds with the child from the first day of the placement. By removing the child from the care of the prospective adoptive parents, the agency forecloses the possibility of adoption. In light of the expectation of permanent custody that attends an adoptive placement, an agency's decision to remove a child constitutes a direct and substantial injury to prospective adoptive parents. Because prospective adoptive parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason in law or policy whey we should limit their standing to sue for custody.

*Id.* at 49–51, 556 A.2d at 423.[4] A recent panel of this Court also recognized the standing of prospective adoptive parents in dependency and custody actions. See *Mollander v. Chiodo*, 450 Pa.Super. 247, 253–255, 675 A.2d 753, 757 (1996), citing *In re: Baby Boy S.*, 420 Pa.Super. 37, 43, 615 A.2d 1355, 1357–

---

**4.** *In Interest of G.C.*, 449 Pa.Super. 258, 673 A.2d 932 (1996), also noted the importance of the fact that *"Mitch* involved prospective adoptive parents rather than ... foster parents[.]" *Id.* at 272, 673 A.2d at 934.

1358 (1992), aff'd Per Curiam, 540 Pa. 302, 657 A.2d 484 (1995) ("Standing ... has also been found in prospective adoptive parents who received custody from an agency[.]"). On this basis, we reject appellees' claim that appellants lack standing to pursue the instant appeal.

■ The third claim we must address before turning to the merits of this appeal is that the contempt proceedings were conducted in violation of appellants' due process rights. Specifically, appellants claim they "had neither notice that their children might be taken from them as a result of the contempt proceedings nor did they have motivation to prepare a defense to removal." (Appellants' brief at 39.) We reject this claim.

Initially, we reiterate that appellants first entered this case as foster parents. As we noted in *G.C.*, "When foster parents enter into their relationship with the child, they know ... that the agency has the authority to remove the child[.]" *In the Interest of G.C., supra* at 266, 673 A.2d at 936 (emphasis in original), citing *In re: Adoption of Crystal D.R.*, 331 Pa.Super. 501, 509–510, 480 A.2d 1146, 1150–51 (1984). Thus, from the very beginning, appellants were on notice that the children could be removed at any time. Moreover, even after entry of the December 17, 1992 Order directing CYS to assist appellants in adopting Byron, which first recognized appellants as prospective adoptive parents, the record indicates that appellants knew or should have known of the court's authority to Order removal. Of particular note is the Order of December 20, 1993, which removed Byron from the custody of appellants for the purpose of reuniting him with his mother. Rather than challenging this Order on due process grounds, appellants created a media spectacle, as they had done before, to prevent Byron's removal. Nonetheless, Byron was removed on December 27, 1993. Since this removal occurred more than one year after appellants were identified as prospective adoptive parents, their claim that they were unaware that removal was an option available to Juvenile Court is dubious.

Further, no less than four contempt petitions were filed against appellants between July of 1995 and the December 13, 1995 hearing date. These pleadings clearly put them on

notice of the subject of the contempt hearings and they do not contend otherwise. Instead, they claim only that they were unaware that removal could result. During their extensive involvement in this case, appellants have attended numerous hearings. They were clearly aware, and do not deny, that determining the best interests of the children was the ultimate goal of every single hearing. As appellants were also aware, several of these hearings resulted in removal Orders. In fact, appellants have seen the children moved, by court Order, from their home to the home of relatives, and from residential placement with their mother back to appellants' home. No notice explicitly providing that removal was an option was provided before any of these hearings. This was so because all parties understood at all times that the broad authority of Juvenile Court to adjudicate in the best interests of dependent children includes the power of removal. Without that power, Juvenile Court's authority would be illusory. Finally, as a matter of common sense, it appears doubtful that appellants were truly under the impression that removal could not result, regardless of the number and types of contempt they committed. In light of these facts, we are convinced that appellants were on notice that removal could result from the hearings of December 13, 1995 and January 17, 1996.[5]

As the transcripts indicate, both appellants presented extensive testimony and were represented by competent counsel throughout the contempt proceedings. They were provided

**5.** Of course, our conclusion that appellants had notice that removal could result from the hearing of December 13, 1995 also means that they had notice that removal could result from the hearing a month later, on January 17, 1996. At any rate, removal was discussed extensively at the conclusion of the hearing of December 13. For instance, Judge Baer stated:

The $64,000 question is whether this record, or this record coupled with what's been heard before by Judge Jaffe, would lead us to believe that it's not in the best interest of these kids to be in this home and, if so, they should be removed[,] and if not, they should be left there. (N.T., 12/13/95, pp. 161–162.) Thus, any claim that appellants were not aware that removal was being considered, at least by the hearing of January 17, 1996, is not credible. Finally, it is interesting to note that at the December 13 hearing appellants' counsel, rather than expressing surprise that removal was an option, argued that removal "would certainly not be in the best interests of the children." (N.T. at 161.)

every opportunity to explain or defend their conduct. Having failed to do so adequately, appellants cannot now complain that they were unaware of the intended purpose of the contempt hearings or that they were denied the opportunity to be heard. Having rejected appellants' due process challenge, we proceed to the substantive issues presented by this appeal.

Specifically, appellants claim "the decision to remove Byron and Byrae from the Derzack home was based on gross misrepresentations and conclusions concerning the Derzacks conduct and was manifestly unreasonable[.]" (Appellants' brief at 19.) A review of appellants' discussion of this issue reveals that, in reality, they are asserting two claims. First, appellants allege an abuse of discretion in the Juvenile Court's "findings that the Derzacks violated court orders for conduct which had been pre-approved by the court, court orders which did not exist at the time of the conduct in question and court orders which the Derzacks had no way of knowing about." (Appellants' brief at 20.) Appellants also claim "to the extent that violations had occurred, none warranted removal of the children from their home[.]" *Id.* Notwithstanding their apparent concession "that violations had occurred", we will address appellants' claim that they did not knowingly violate any Orders of court.

 Initially, we note our standard of review:

It is of course true that our paramount concern in child custody cases is to determine the best interests of the child. Thus, appellate review of child custody Orders is of the broadest type, and we may modify the trial court's custody determination where it is shown by evidence of record to be manifestly unreasonable[.] Further, our review is not bound by the trial court's deductions, inferences and interpretations of evidence and we will exercise independent judgment to consider the merits of the case and to enter an order that is correct and just.

*In Interest of G.C., supra* at 280, 673 A.2d at 943 (citations omitted).

However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own

independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*McMillen v. McMillen,* 529 Pa. 198, 202, 602 A.2d 845, 847 (1992) (citations omitted).

Applying this standard of review to the record before us, we find no error in Juvenile Court's conclusion that appellants were in contempt of court. In order to maximize the clarity of this analysis, the Orders at issue in this appeal are summarized as follows and the acts of appellants which violated these Orders are then addressed seriatim:

1. Order of October 5, 1994; requiring, inter alia, "consent for the child to travel out of the jurisdiction[.]" (R. 361b.)

2. Order of October 6, 1994; requiring "significant follow-up services . . . including but not limited to in-home services and mental health counseling" and authorizing CYS supervised visits by mother, paternal grandmother and siblings. (R. 363–364b.)

3. Order of November 14, 1994; requiring "that parties are to have no contact with the public vis-a-vis discussing or referring to this case in any public context or forum." (R. 365b.)

4. Two Orders dated April 12, 1995; requiring sibling visitation "every other Wednesday from 4:00 p.m. until 6:00 p.m." and visitation by the children's paternal grandmother, Flora Griffin Shapiro "every other Tuesday from 3:30 p.m. until 7:30 p.m." (R. 368b.)

5. Order of May 9, 1995; requiring that CYS "arrange for therapeutic intervention and counseling for Byron and Byrae, and for an evaluation of the effect of the visitations on Byron and Byrae" and directing CYS "to make announced and unannounced visits" at the Derzack home. (R. 370b.)

6. Order of July 14, 1995; requiring appellants to correct their adoption/foster care application and adoption petition

to reflect appellant/wife's previous psychiatric history and to provide proof of appellants' annual income for the previous five years. (R. 372b.)

7. Order of August 14, 1995; stating "specifically, Michael and Karen Derzack are not permitted to observe, attend or participate in [sibling] visits." (R. 373b.)

8. Order of October 13, 1995; requiring appellants to permit announced and unannounced home visits with the children by CYS caseworker. (R. 375b.)

## TRAVEL OUTSIDE OF ALLEGHENY COUNTY

Juvenile Court found a violation of the October 5, 1994 contempt Order based on appellants' "travel with Byron and Byrae to California and New York to tape television programs without written permission from CYS or consent of court to travel outside of Allegheny County." (Slip Op. at 22.) Initially, appellants claim they were unaware "that the October 5, 1994 Order existed prior to the contempt hearing of December 13, 1995." (Appellants' brief at 21.) Appellants also refer to the Order as the "purported Order", id., and state that they are "left wondering about the origins of the October 5 order", id. at 23. Nonetheless, our review of the certified copy of docket entries in this case reveals that the "purported" Order was filed with the prothonotary on the date it was issued. In the absence of an allegation that the Order was somehow filed in error, we do not share appellant's concerns about "the origins of the October 5 order".

Appellants also claim they were never informed by CYS that permission was required before the children were taken outside of Allegheny County. Likewise, they claim they never received the CYS foster care manual, which expressly states that permission is required before foster children may leave the jurisdiction. The record belies appellants' contention that they were unaware of the permission requirement. For instance, at the December 13, 1995 contempt hearing, counsel for CYS entered into evidence a vacation permission form, identified as Exhibit N, which had been filed by appel-

lants on June 1, 1995 (N.T., 12/13/95, p. 50). The form indicates that appellants had sought and received permission from CYS to take Byrae on vacation from June 8 through June 12, 1995. In light of this form, it is clear that appellants knew of the requirement that they seek permission prior to taking the children out of Allegheny County.

The date on which appellants sought permission to take Byrae on vacation also is relevant in light of the dates on which Juvenile Court found violations of the October 5, 1994 Order. For instance, the court found that appellants had violated the Order by traveling, with the children, to California on November 9, 1995 in order to tape the nationally televised talk show "Leeza". Thus, more than five months after appellants filed the form of June 1, 1995, thereby manifesting awareness of the permission requirement, they traveled with the children to California without requesting permission to do so.

Moreover, because the children also appeared on camera during the taping of the "Leeza" show, appellants cannot and do not deny that they took the children to California. Instead, they gloss over this violation and argue only that they did not also take the children to New York to tape another talk show. However, a finding of contempt is not dependent upon the number of times a court Order is violated, and we find no abuse of discretion in the Juvenile Court's conclusion that appellants violated the Order of October 5, 1994, when they admittedly traveled with the children to California.

Finally, in considering appellants' denial that they also took the children to New York, we note that the testimony of both appellants, as a general matter, was deemed incredible by Juvenile Court. For instance, the court states that on numerous occasions, Mrs. Derzack's testimony was contrary to "the undisputable evidence presented at the hearing" (Slip Op. at 13), and "both Karen Derzack and Michael Derzack further attempted to ridicule the court by being coy and evasive when responding to questions asked during cross-examination."

(Slip Op. at 16.) [6] In a separate Opinion in support of the court's determination, Judge Jaffe also states:

> Beyond the violations of the Court Orders, I was astonished by the deceit and boldness exhibited by both Karen and Michael Derzack during their testimony at the hearing. Both repeatedly either flatly denied violating the Orders or claimed a lack of recollection of the events when faced with indisputable evidence of the violations.

(Slip Op., Jaffe, J., 4/1/96, p. 5.) Particularly in light of this adverse credibility determination, we find appellants' bald denial that they took the children to New York an insufficient basis upon which to conclude that Juvenile Court abused its discretion.[7]

### TERMINATION OF FAMILY VISITATION

██ Juvenile Court determined that appellants had violated the Orders of October 6, 1994, April 12, 1995 and August 14, 1995 by unilaterally terminating court-ordered visitation by

6. For example, Mrs. Derzack testified as follows:
 Q. [COUNSEL FOR CYS]: You admit that you failed to request permission of CYS or this Court to go to California to tape the Leeza show?
 A. I do not admit that.
 Q. Did you ask permission?
 A. From?
 Q. From CYS or this Court to go tape the Leeza show in California?
 A. No, I do not.
 Q. But yet you don't consider that a violation of Court Orders in this case?
 A. I did not violate any Court Order.
 (N.T., 12/13/95, p. 113.)

7. We also note that Juvenile Court "[took] judicial notice of Byron and Byrae's appearance on camera on at least three ... televised talk shows." (Slip Op. at 12.) Although neither the Opinion nor the record disclose specifically which talk shows this statement references, it is clear that none of the shows discussed by the court originate in Allegheny County. Unless all of the relevant segments were taped in this county, which appears unlikely and is not claimed by appellants, the court may well have found additional violations of the October 5, 1994 Order. At any rate, in light of appellants' admission that they travelled with the children to California to tape "Leeza", there is no question that appellants were properly found in contempt of the Order prohibiting such travel.

the childrens' mother, siblings, paternal grandmother and maternal great aunt. In their brief, appellants concede that "[t]he record reflects that the Derzacks, at some point in time, did not comply with the family visitation orders." (Appellants' brief at 33.) However, they claim "[t]he record also reflects that in failing to facilitate with visits, the Derzacks were following their [former] attorney's instructions and his advice that they were not required to permit visits." *Id.* Initially, we note that our thorough review of the testimony presented by appellants at the contempt hearings indicates that they did not raise this "defense" prior to the instant appeal. In fact, at the December 13, 1995 contempt hearing, Mr. Derzack testified as follows:

Q. [COUNSEL FOR MARION ELLIS, the children's great aunt]: [T]his is part and parcel of the reason why you and your wife unilaterally decided not to adhere to the visitation order?

A. I don't think that we ever violated the visitation order.

Q. There hasn't been a visit since August [1995]; is that correct?

A. I felt that Judge Jaffe had canceled those visits.

(N.T., 12/13/95, p. 140.) Therefore, rather than claiming appellants had terminated visitation on the advice of counsel, Mr. Derzack stated his belief that visitation had been "canceled". Appellants have not offered a shred of evidence either explaining or substantiating this belief. Mrs. Derzack also testified as to visitation:

Q. Mrs. Derzack, you are certainly aware of the various orders that have been entered by Judge Jaffe concerning the sibling visits between Byron and Byrae, are you not?

A. Yes.

Q. In fact, visits occurred up until some point in August of 1995; is that correct?

A. I don't remember dates, but yes.

Q. Do you intend to allow visits to occur in the future, or is it your belief that, as you just indicated, you don't think that Judge Jaffe had the authority to enter those orders?

A. I can't speak for the future.

(N.T. at 124–125.) Thus, rather than claiming that she terminated visitation on the advice of counsel, Mrs. Derzack defiantly asserted the possibility that she would disobey future visitation Orders.

As this testimony indicates, appellants' claim that they were relying on the advice of counsel in discontinuing visitation has been raised for the first time on appeal and, for this reason, we may not consider it. See *In re D.D.*, 409 Pa.Super. 35, 47–50, 597 A.2d 648, 654–655 (1991) ("The issue was not raised and properly preserved on the record in the Juvenile Court and is therefor[e] waived. It cannot be raised for the first time on appeal."); Pa.R.A.P. 302 ("*Rule 302. Requisites for Reviewable Issue (1) General rule.* Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). A party violates court Orders at his peril and we will not recognize appellants' tardy attempt to blame former counsel.[8] The Orders of October 6, 1994, April 12, 1995 and August 14, 1995 clearly provide for visitation and appellants admit that they "did not comply" with these Orders. In light of this admission, and having rejected appellants' sole alleged defense, we find no error in Juvenile Court's determination that appellants were in contempt of the visitation Orders of October 6, 1994, April 12, 1995 and August 14, 1995.

**8.** We note that appellants' hearing counsel expressly denied that he directed his clients to disobey the visitation Order. Following Mrs. Derzack's statement that she "can't speak for the future", the following exchange occurred:

Q. [JUDGE CRAIG]: Not to give you a hard time, Mr. Bloom, but your client seems to be saying to me that she can't speak to whether she's going to comply with any Orders—

. . .

A. [APPELLANTS' COUNSEL]: I understand, but that would not be my direction to my client, Judge.

(N.T. at 160.)

## TERMINATION OF THERAPY AND COUNSELING

 Juvenile Court found that "in contravention to [the] Orders of October 6, 1994 and May 9, 1995, the Derzacks failed or refused to take the children to a mental health professional.... As with the visitation privileges, the Derzacks cancelled or failed to schedule appointments with Dr. [Debra] Klosterman between July 1995 and October 12, 1995." (Slip Op. at 22.) Despite the court's finding that there were no therapy sessions between "July 1995 and October 12, 1995", appellants claim that "through their own efforts, [they] scheduled about seven sessions with Dr. Klosterman through October 12, 1995." (Appellants' brief at 34.) Once again, the record belies appellants' assertion. In fact, at the hearing of December 13, 1995, Mrs. Derzack testified:

Q. [COUNSEL FOR THE CHILDREN]: You were aware, were you not, that neither Byron nor Byrae was receiving any therapy since this summer at least?

A. They haven't been since I've not taken them.

Q. And nobody else has had them outside of your custody that would be taking them either; is that correct?

A. Correct.

(N.T. at 120.) Thus, despite the present claim to the contrary, Mrs. Derzack admitted at the hearing of December 13, 1995 that "neither Byron nor Byrae was receiving any therapy since [the] summer [of 1995]." Further, CYS caseworker Timothy Jashinski testified:

Q. [COUNSEL FOR CYS]: [A]t some point did the Derzacks abruptly terminate the therapy for Byron and Byrae?

A. Yes. The therapy was terminated after Debbie Klosterman met with the Law Department.

Q. And why did she meet with the Law Department?

A. The Law Department wanted to go over what was necessary for her to accomplish during these evaluations.

Q. Do you know whether Children & Youth Services had been Ordered to pay for Dr. Klosterman?

A. Yes. On this Court Order of May 9th it Orders CYS to pay.

Q. And you were at that meeting;is that correct, Mr. Jashinski?

A. With Debbie Klosterman? Yes,I was.

Q. And the purpose of that meeting was to hire Dr. Klosterman and pay her for her services; is that correct?

A. Yes.

Q. And you're stating that it was after this meeting that Mr. and Mrs. Derzack abruptly canceled the children's therapy; is that right?

A. Yes.

Q. And was that back sometime in July of 1995?

A. Yes.

Q. Were they given permission to do this?

A. To stop the therapy?

Q. To stop the therapy.

A. No.

Q. Was that a violation of this Court's Order?

A. Yes.

(N.T. at 40–41.) Mr. Jashinski's testimony, in addition to the admission of Mrs. Derzack, indicates that appellants unilaterally terminated court-ordered therapy in July 1995.

This may well have been the most egregious of the many acts of contempt committed by appellants. At all times, appellants were fully aware of the extremely traumatic background of Byron and Byrae. Both appellants also testified at the hearing of December 13, 1995 that they believed Byrae had been sexually molested (N.T. at 118 (Mrs. Derzack), 134 (Mr. Derzack)). Nonetheless, appellants prevented the children from receiving the professional help they so desperately and obviously needed.

Finally, although appellants admit that "[n]o visits were scheduled between mid-October and December" (appellants' brief at 35), they attempt to justify this failure on the basis that they "were extremely uncomfortable with the situation after CYS had directed Dr. Klosterman to exclude them as recipients of her reports." *Id.* As this statement indicates,

appellants placed their own desires, and their disdain for CYS, over the needs of the children. We reiterate that the Legislature has vested Juvenile Court, rather than appellants, with the ultimate authority to adjudicate in the best interests of dependent children. It is simply irrelevant that appellants became "uncomfortable" with the court's exercise of that authority. Having ignored this principle, appellants were properly found in contempt of the Orders of October 6, 1994 and May 9, 1995..

## EXPOSURE OF THE CHILDREN TO PUBLICITY

 Juvenile Court found that appellants had repeatedly conducted media interviews and appeared on national talk shows in violation of the prohibition of the November 14, 1994 "Gag" Order "that parties are to have no contact with the public vis a vis discussing or referring to this case in any public context or forum." Order, 11/14/94, p. 365b.[9] Specifically, the court found that appellants had discussed the case on numerous nationally televised talk shows, including "Rikki Lake", "Montel Williams", "Sally Jesse Raphael" and "Leeza". (Slip Op. at 23.)

In a pattern of argument which is by now familiar, appellants claim that they did not violate the Order as many times as Juvenile Court determined. Specifically, they claim that taping of the "Rikki Lake" show preceded the effective date of the gag Order.[10] Appellants do not discuss, and thus do not contest, that they appeared on the remaining shows cited by Juvenile Court. Instead, they claim the gag Order is an

9. This Order was vacated on May 21, 1996, after appellants lost custody of the children.

10. Appellants also claim they had the permission of Judge Jaffe to appear on "The Maury Povich Show" on October 20, 1994. In the section of its Opinion setting forth the relevant facts, Juvenile Court notes that this appearance violated the Order of January 24, 1994 (Slip Op. at 10), which preceded the gag Order of November 14, 1994. However, the Order of January 24, 1994 was not one of the eight Orders relied upon by Juvenile Court to find appellants in contempt of court. Thus, whether or not appellants violated the Order of January 24, 1994 is irrelevant to the instant appeal, and we need not consider appellants' claim that they had permission to appear on "The Maury Povich Show."

unconstitutional restriction on free speech. However, we note that appellants have never challenged the Order of November 14, 1994 on appeal, much less within 30 days as required by Pa.R.A.P. 903. Further, the issue of constitutionality was raised neither in a motion to reconsider the Juvenile Court's contempt Order of January 17, 1996 nor in appellants' statement of matters complained of on appeal. In fact, our thorough review of the entire record before us reveals that the alleged unconstitutionality of the Order of November 14, 1994 was never raised, or even contemplated, at any stage of this litigation.

At any rate, is is appellants' responsibility to demonstrate, with relevant citations to the record, that this issue has been preserved. For instance, Pa.R.A.P. 2117(c) provides:

**Rule 2117. Statement of the Case**

. . .

**(c) Statement of place of raising or preservation of issues.** Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the statement of the case shall also specify:

(1) The state of the proceedings in the court of first instance, and in any appellate court below, at which, and the manner in which, the questions sought to be reviewed were raised.

(2) The method of raising them (e.g. by a pleading, by a request to charge and exceptions, etc.).

(3) The way in which they were passed upon by the court.

(4) Such pertinent quotations of specific portions of the record, or summary thereof, with specific reference to the places in the record where the matter appears (e.g. ruling or exceptions thereto, etc.) as will show that the question was timely and properly raised below so as to preserve the question on appeal.

*Id.* Further, Pa.R.A.P. 2119(e) provides:

**Rule 2119. Argument**

. . .

**(e) Statement of place of raising or preservation of issues.** Where under the applicable law an issue is not reviewable on appeal unless raised or preserve below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross reference to the page or pages of the statement of the case which set forth the information relating thereto required pursuant to Rule 2117(c) (statement of place of raising or preservation of issues), or substantially the same information.

*Id.*

In characteristic fashion, appellants make no effort to comply with the mandate of these rules. Instead, in a one-paragraph argument, they direct our attention to Pa.R.C.P. 1930.2(a) (Appellants' reply brief at 4). The Rule provides:

**Rule 1930.2 No Post–Trial Practice. Motions for Reconsideration**

(a) There shall be no motion for post-trial relief in any domestic relations matter except that where a paternity matter is tried by jury, post-trial practice shall be permitted in accordance with Rule of Civil Procedure 227.1.

*Id.*

From this rule abrogating the need for post-trial motions in domestic relations matters, appellants apparently extract the principle that an issue which was never presented at trial can be advanced on appeal. This is patently false. See Pa.R.A.P. 302, supra ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *In re D.D., supra* at 49, 597 A.2d at 654–655 ("The issue was not raised and properly preserved on the record in the Juvenile Court and is therefore waived. It cannot be raised for the first time on appeal."); *In re Frederick F.,* 400 Pa.Super. 542, 546 n. 7, 583 A.2d 1248, 1250 n. 7 (1990) (issue not raised in Juvenile Court deemed waived on appeal). Rather than challenging the Order of November 14, 1994 in compliance with the rules of appellate procedure, appellants have instead violated it in an arrogant fashion and now seek to nullify the

474

consequences of the violations by challenging the constitutionality of the Order for the first time on appeal. We will not allow such brazen disregard of court Orders and rules of court. Appellants' challenge to the constitutionality of the Order of November 14, 1994 is waived. *Commonwealth v. Hawkins*, 295 Pa.Super. 429, 439 n. 6, 441 A.2d 1308, 1312 n. 6 (1982) ("[I]ssues, even those of constitutional dimension, cannot be raised for the first time on appeal[.] ").[11] In a more

11. On several occasions, appellants' brief refers to a federal lawsuit, *Focus v. Allegheny County Court of Common Pleas*, Civil Action NO. 94–2160 (W.D.Pa.), filed on June 7, 1994, by the appellants' current counsel, acting for the American Civil Liberties Union and on behalf of "a community group interested in juvenile court proceedings" (Appellants' brief at 6). Neither appellants nor CYS were parties to the action, which challenged the constitutionality of the gag Orders predating the Order of November 14, 1994. Although we have been provided only with the caption of the case, our review indicates that is was dismissed by Federal District Court on Eleventh Amendment grounds and for lack of subject matter jurisdiction. Thereafter, the Third Circuit Court of Appeals reversed and remanded on procedural and jurisdictional grounds. *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834 (3d Cir.1996). However, the parties apparently settled the case before remand proceedings could be held. Thus, Focus' constitutional challenge to the gag Orders was never adjudicated.

While the parties agree that the gag Order of November 14, 1994 was vacated on May 21, 1996, they disagree on the import of the federal litigation. Appellants claim "[t]he November 14, 1994 gag Order was finally vacated on May 21, 1996 as part of the resolution of the federal lawsuit filed by Focus[.]" (Appellants' brief at 10.) Appellee/children claim "[t]he Order in question was vacated by Judge Jaffe in the Court of Common Pleas at the request of counsel for the minor children ... since the parties who had been guilty of harming the children by relentless publicity-seeking, namely the Derzacks and to a lesser extent the family members, were no longer formal parties to the case since the children had been removed from the Derzacks and the mother's parental rights were terminated. Since the Order had been vacated the federal District Court action was settled, being moot." (Appellee's brief at 3–4.) Neither Juvenile Court Opinion discloses whether the Order of November 14, 1994 was vacated on May 21, 1996 as a result of "the resolution of the federal lawsuit", or because the issue of publicity was moot, the children having been removed from appellants. However, even assuming the accurately of appellants' contention, we can discern no relevance of the federal action to the instant appeal. Initially, the Third Circuit confirmed the fact that "neither party to the Baby Byron case is on record as being opposed to the gag orders." *Focus*, 75 F.3d at 839. Since the federal action did not involve the parties to the instant case, it did not preserve appellants' current challenge to the Order's constitutionality. As noted, appellants have violated Rules of

fundamental manner, it is evident that Rule 1930.2 (relating to post-trial matters in domestic relations cases), as relied upon by appellants, does not apply in Juvenile Court proceedings, which are governed entirely by 42 Pa.C.S. § 6301 et seq. See *In re Gorham*, 272 Pa.Super. 145, 148, 414 A.2d 712, 713 (1979) ("[A] juvenile proceeding is not 'a matter subject to the Pennsylvania Rules of Civil Procedure'."); and *Commonwealth v. Clay*, 376 Pa.Super. 425, 429, 546 A.2d 101, 103 (1988) ("[T]he procedures for post-trial review contained in the Pennsylvania Rules of Civil Procedure do not apply to juvenile proceedings unless specifically provided otherwise.").[12]

As to whether appellants actually violated the Order of November 14, 1994, the record again reveals evasive testimony. For instance, Mrs. Derzack testified:

> Q. [COUNSEL FOR CYS]: With regard to the Gag Order, it's also my understanding that you have appeared on the Rikki Lake show; is that correct?
>
> A. Yes.
>
> Q. And you've appeared on the Montel Williams show; is that correct?
>
> A. Yes.
>
> Q. You admit you appeared on Sally Jesse Raphael; is that right?
>
> A. Yes.
>
> Q. And you also admit that you've appeared on the Leeza show?
>
> A. Yes.

Appellate Procedure 302, 2117(c) and 2119(c), relating to the preservation of issues, and we are aware of no authority, nor do appellants cite any, indicating that a federal lawsuit filed by unrelated plaintiffs can cure the waiver of an issue by parties to a state proceeding. Finally, since the federal lawsuit was never resolved on the merits, we are not confronted by an Order which has been found by a federal court to violate the United States Constitution.

**12.** Although neither the Rules of Civil Procedure nor the Rules of Criminal Procedure apply to Juvenile Court, the Rules of Appellate Procedure do apply to appeals from that court, as indicated by the prior citations.

. . .

Q. Do you admit that you violated this Court's Gag Order with regard to your appearances on Rikki Lake and Montel Williams and Leeza?

A. Do I admit I violated them?

Q. Yes.

A. No, I do not.

(N.T. at 111–112.)

Q. Did you talk about Byron and Byrae on the Leeza Gibbons show?

A. Yes, in general.

Q. What did you talk about?

A. I don't remember specifics.

Q. Do you know in general what you talked about?

A. To be honest with you, no, I do not.

Q. So you don't remember anything at all that you said on the Leeza Gibbons show that you just taped on November 9th [1995]. That what you're asking us to believe?

A. I don't remember.

Q. You don't remember whether you remember?

A. I don't remember anything that I talked about there.

(N.T. at 123.) Similarly, Mr. Derzack testified as follows:

Q. [COUNSEL FOR THE CHILDREN]: Did you hear your wife talk about the talk shows that she's spoken about during her testimony? Were you present also?

A. In some instances.

Q. Which ones were you there for?

A. Rikki Lake, Montel Williams, and Leeza Gibbons.

Q. Did you appear on camera on any of those shows?

A. Yes.

Q. Which ones?

A. All three.

Q. Did you talk about Byron and Byrae on any of those shows?

A. The Montel Williams show, no. The Rikki Lake, it was several years ago. On the Leeza Gibbons show, I don't recall mentioning their names.

Q. Did you talk about them?

A. I really don't recall lights, cameras.

(N.T. at 135.) Therefore, although "Leeza" was taped less than five weeks prior to the December 13, 1995 hearing, neither appellant could recall anything that was discussed. Nonetheless, despite a final attempt at evasion, Mr. Derzack ultimately relented:

Q. [COUNSEL FOR THE CHILDREN]: Have you violated the Court's prohibition against referring to or discussing the case in any public forum?

A. I don't know how to best answer that, other than to say—

Q. Try yes or no.

A. There's nothing in between? If you read it by the letter of the law and if that law is enforceable, then, yes, we have violated the Order.

(N.T. at 137.)

In light of this admission, and our rejection of appellants' attack upon the constitutionality of the "gag" Order, it is clear that Juvenile Court was correct in finding that appellants had repeatedly violated the Order.

## TERMINATION OF CYS VISITATION

 Juvenile Court found that appellants had violated the Orders of May 9 and October 13, 1995 by refusing to permit announced and unannounced visits by CYS.[13] At the December 13, 1995 contempt hearing, CYS caseworker Timothy Jashinski testified as follows:

Q. [COUNSEL FOR CYS]: Just to clarify, up until around August of 1995 you were making regular visits; is that right?

13. The Order of October 13, 1995, which reaffirmed the mandate of the Order of May 9, 1995, was entered in response to a contempt petition filed by CYS after appellants failed to comply with the former Order.

A. Yes.

Q. And then for some reason during this particular time in August and then in September.[appellants] stated they were in loco parentis and that you weren't allowed to visit; is that right?

A. Right.

(N.T. at 15.)

. . .

Q. Did you attempt to visit the Derzack residence after the issuance of the October 13, 1995 Order?

A. Yes, I did.

. . .

Q. Was Mrs. Derzack friendly to you when you came to the door?

A. I wouldn't say friendly, no.

Q. So she ushered you in, and then what happened?

. . .

A. I was at the bottom in the entrance of the house. I said hello to the kids. The kids said hi to me. I asked them how they were doing. They said fine. Then I pro-ceeded—Mr. Derzack had mentioned something about them going to a Halloween party, so I just asked them, you know, if they were ready for trick or treating or what they were going to be, and then Mrs. Derzack abruptly ended the visit.

(N.T. at 17–18.)

As with their claim regarding family visitation, appellants claim they terminated CYS visitation "only after their [former] attorney advised them that they were in loco parentis and that visits were no longer permitted." (Appellants' brief at 34.) Once again, this claim is contrary to the hearing testimony and is presented for the first time on appeal. For instance, Mrs. Derzack testified as follows:

Q. [COUNSEL FOR CYS]: You admit that you refused to allow Mr. Jashinski access to Byron and Byrae?

A. No.

Q. You're denying that?

A. Yes.

Q. You deny that you ordered Mr. Jashinski from your home on October 27, 1995?

A. I deny that.

. . .

Q. Going back to Mr. Jashinski's visits, do you deny that you violated this Court's Order with regard to those visits?

A. I did not go against the Court Order. I deny that.

(N.T. at 111.)

As this testimony indicates, rather than claiming appellants violated the Orders of May 9 and October 13, 1995 on the advice of counsel, Mrs. Derzack flatly denied that she refused visitation or violated the Orders.[14] As such, Mrs. Derzack's testimony directly contradicted that of Mr. Jashinski and the credibility of these witnesses was a matter for Juvenile Court, as finder of fact. *Commonwealth v. Lawson*, 437 Pa.Super. 521, 650 A.2d 876 (1994), appeal denied, 540 Pa. 596, 655 A.2d 985 (1995). Particularly in light of the express finding that appellants' testimony was incredible, we find no error in the court's decision to credit Mr. Jashinski's testimony. Accordingly, we perceive no abuse of discretion in Juvenile Court's conclusion that appellants violated the visitation Orders of May 9 and October 13, 1995.

14. Mrs. Derzack did, however, question the authority of Juvenile Court to order visitation. She testified:
Q. [COUNSEL FOR CYS]: [D]oes [Judge Jaffe] have the right to Order Mr. Jashinski to visit your home to interview Byron and Byrae?
A. I don't know.
Q. So I guess what you're saying is you don't know whether Judge Jaffe has the right to enter any Order in this case; is that right?
A. I don't know.
(N.T., 12/13/95, p. 114.)

### REFUSAL TO CORRECT ADOPTION APPLICATION

Finally, Juvenile Court determined that appellants had violated the Order of July 14, 1995, which required that they correct the adoption/foster care application and adoption petition to reflect Mrs. Derzack's previous psychiatric history and provide proof of annual income for the previous five years. The court based this determination on the following facts:

Both the foster care application and the adoption application specially requested psychological and financial information. This information gives important insight to the prospective foster care and adoptive parents' emotional and financial stability to maintain the child being entrusted to their care and must be answered truthfully, if the best interest of the child is to be served. In response to these two specific questions on the adoption application filed by the Derzacks in August 1994, Karen Derzack responded "no" to the question addressing prior mental health treatment when, in fact, she had suffered from depression and a mental disorder which required professional treatment. Additionally, Michael Derzack listed their 1993 annual income as $168,-000.00 when, in fact, his [federal] income tax statements reflected an income of $102,736.41 for a three year period extending from 1990–1993.

(Slip Op. at 25.)

As to their failures to comply with the Order of July 15, 1995, appellants present several characteristic arguments. Initially, they claim the Order "simply does not say what the Court claims in attempting to justify its removal Order." (Appellants' brief at 32.) Appellants also claim "[t]he order does not indicate who it is directed to and it neither mentions the adoption papers nor the Derzacks' income." *Id.* The Order of July 14, 1995 provides in relevant part:

Attempt correction by amended petition through me after correspondence between parties.

Order, 7/14/95, R. 372(b). Appellants are correct that this Order does not expressly mention them by name. However, since it was appellants who filed the original petition for

adoption, we wonder who they believed the court was directing to file an amended petition. Further, since Mrs. Derzack's mental health history was the subject of the hearing which immediately preceded the Order, "amended" is characteristically disingenuous. Once again, rather than seeking to clarify their alleged confusion before the court, appellants blatantly violated a valid court Order and now seek to avoid the consequences of that violation by pleading ignorance. We will not countenance such evasion.

Appellants also seek to excuse their admitted misrepresentation as to Mrs. Derzack's mental health history by arguing that she had disclosed this history in a hearing prior to the placement of the children in their home. Thus, according to appellants, "the lower court and CYS were well aware of the discrepancy between the adoption application and Ms. Derzack's actual medical history[.]" (Appellants' brief at 31.) Appellants' argument fails. Merely because the court ultimately was informed of appellants' misrepresentation, it does not follow that appellants are somehow excused from the consequences of that misrepresentation. Similarly, the fact that Mrs. Derzack misrepresented her medical history on only one of the two occasions it was addressed does not nullify the misrepresentation. At any rate, appellants were not held in contempt for making the misrepresentation. Rather, they were held in contempt for disobeying a court Order to correct the misrepresentation. Therefore, the question at issue is whether appellants complied with the mandate of the July 15, 1995 Order that they correct their adoption petition, and the record clearly indicates that they did not. In fact, at no point have appellants claimed otherwise.

As to their failure to correct the income reported on the application form, appellants attack Juvenile Court's reliance on their federal income tax returns, because "it is just as likely, from the evidence of record, that the Derzacks told the truth on the adoption papers and engaged in loose accounting methods for tax purposes." (Appellants' brief at 32.) Thus, according to appellants, Juvenile Court erred in finding appellants in contempt of the July 15, 1995 Order because it

was unable to tell on which sworn document appellants lied. Initially, we reiterate that the overriding concern of Juvenile Court, in considering the best interests of dependent children, is the fitness of adoptive parents. Of course, untruthfulness in any form must be considered by the court, and it is irrelevant which of the two documents at issue manifests a lie by appellants. Moreover, when presented with an opportunity to clarify his misstated income, Mr. Derzack testified as follows:

Q. [COUNSEL FOR CYS]: With regard to the information about the yearly income, now, you filled this [adoption] application out in August of 1994; is that correct?

A. Yes.

Q. Those are your signatures; is that correct [indicating]?

A. Yes.

Q. When you indicate yearly income of $168,000.00, that's for the year 1994?

A. On the advice of counsel, I'm going to refuse to answer that.

(N.T. at 128–129.) Mr. Derzack was then properly informed by the court that, in a civil proceeding, a negative inference may be drawn when a witness invokes the Fifth Amendment privilege against self-incrimination (N.T. at 129). See *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.' 8. J. Wigmore, Evidence 439 (McNaughton rev 1961)".). Despite the court's warning, Mr. Derzack again invoked the privilege:

Q. Isn't it true, Mr. Derzack, that with regard to this yearly income figure, whether it be—assuming it's 1994 or whatever year—that you gave the Internal Revenue Service different figures for your same income?

A. Once again, on the advice of counsel, I'm going to refuse to answer that and invoke my Fifth Amendment privilege.

(N.T. at 129–130.) Thereafter, Juvenile Court, whose role it was to determine the credibility of witnesses, found that appellants had misstated their income on the adoption application. Appellants do not contest that they never corrected the improper income figure, as mandated by court Order. On this basis, we find no abuse of discretion in the court's conclusion that appellants violated the Order of July 14, 1995.

■ As this review indicates, it is appellants, rather than Juvenile Court, who seek to distort the record presented below. Viewed accurately, the record clearly reveals that appellants have cavalierly violated each and every Order cited by Juvenile Court, and the contempt citations therefore were proper. However, it does not necessarily follow that even repeated and blatant violations of numerous court Orders should result in removal of the children from appellants' care. As Judge Baer stated at the conclusion of the January 17, 1996 hearing, "We need to have a thick skin here. We're not going to use these children to punish these adults." (N.T. at 152.) Thus, consistent with our primary concern, the best interests of Byron and Byrae Griffin, we must consider whether removal was warranted under the facts of this case. We find that it was.

Our conclusion turns on the nature of the contempts committed by appellants. Had appellants' conduct, no matter how defiant, been directed solely at the court, with no resulting impact on the children, we would be loathe to sanction removal. Simply put, removal is not an appropriate contempt sanction. A fine or even incarceration might well be more appropriate, so long as the children's best interests were thereby served. However, appellants' conduct in the instant case has repeatedly and adversely affected the overall welfare of the children. Accordingly, we find that removal served the best interests of the children, and was not ordered as a contempt sanction.

Initially, appellants' decisions to take the children out of Allegheny County without notifying CYS and the court, and to unilaterally cancel visitation by CYS caseworker Jashinski, potentially placed the children at risk. At the contempt hearing of December 13, 1995, Mr. Jashinski testified in detail as to the importance of knowing the children's location at all times:

Q. [COUNSEL FOR CYS]: And one thing about leaving the jurisdiction, Mr. Jashinski. Can you tell us why it's important for foster parents or potential adoptive parents to notify CYS or the Court about leaving the jurisdiction?

A. Well, in case of an emergency, we need to know where to get in touch with the people. In case something happens to the kids why they are out of country, we need to know that, in fact, they were there so that they can get appropriate help.

Q. Is CYS also responsible for making any medical decisions for these children?

A. Yes. Yes, they do.

Q. As a dependent child?

A. As a dependent child, yes.

Q. So it's fair to say that if something happened to Byron and Byrae out in California, you would need to know that so that you could, in fact—so CYS could, in fact, determine medical treatment and what would be appropriate; isn't that correct?

A. Right. We would have to consent to any treatment that would be given to them.

Q. And if you don't know where they are, you can't consent, can you?

A. No.

Q. And also with regard to leaving the jurisdiction when you talk about emergencies, would you want to know where Byron and Byrae are at all times with regard to their natural family in any emergencies there and with regard to their siblings or their aunts or uncles or natural mother?

A. Well, yes. It would be important to know where to contact the family to pass on that information.

(N.T. at 50–52.) Further, Juvenile Court explained:

CYS, as agent for the court, placed Byron and Byrae into the care and custody of the Derzacks. Legal custody of the children, however, remained with CYS and the court and, as such, CYS was, at all times, ultimately responsible for the welfare of Byron and Byrae. This responsibility included a duty to monitor the Derzacks' treatment of the children and the children's adjustment to the Derzacks and their home environment. Monitoring was absolutely necessary in order for CYS to assure the Court that Byron and Byrae were 1) safe, 2) provided for and 3) free of issues that needed to be addressed.

(Slip Op. at 20.)

By removing the children from Allegheny County without consent and by refusing to allow visitation with Mr. Jashinski, appellants effectively precluded supervision by CYS and the court, the authorities ultimately charged with ensuring the welfare of Byron and Byrae. Clearly, by preventing such supervision, appellants placed the children at risk and thus adversely affected their best interests.

Similarly, appellants' refusal to allow family and sibling visitation was not in the best interests of the children. As Juvenile Court explained:

The Court Orders [requiring visitation] were based upon Byron and Byrae's psychological bond with these relatives and the harm that would occur, if the children were separated from them.

. . .

The Court believed regular, private, visits with family members to be so important to the healthy development of Byron and Byrae that it also ordered the rescheduling of any visit which had not occurred on the regularly scheduled date.

(Slip Op. at 21.) Appellants' refusal to allow visits by the childrens' mother, siblings, paternal grandmother and maternal great aunt operated to deprive the children of any contact with their biological family. No expert testimony is necessary to establish that such a deprivation can be harmful. Nonetheless, the court had before it the testimony of Dr. Patricia A. Piercy, Ph.D., a child psychologist, who stated:

> [I]f the Court decides that the Derzacks should have the children, then I would strongly recommend that there are some resources available for Mrs. Ellis and her family. It would put a tremendous stress on them and on the children in that family.... I think consideration should also be given to the sibling contact which had been the sibling relationship, the relationship between all five siblings, and that contact [should] be preserved in some way.

(N.T., 10/5/94, p. 25.) Accordingly, appellants' termination of family visitation did not serve the best interests of the children.

Likewise, as to appellants' repeated exposure of the children to intense publicity, Juvenile Court had before it extensive testimony from several witnesses that such exposure was harmful. For instance, Mr. Jashinski testified:

> Q. [COUNSEL FOR CYS]: Mr. Jashinski, do you have concerns about Byron and Byrae being exposed to the public?
>
> A. Yes. It's always certainly a concern to have children exposed to any type of unwarranted publicity. I mean, the damages that can be done are extremely exorbitant.

(N.T., 12/13/95, p. 25.) In fact, Mr. Derzack also recognized the importance of keeping the children out of the public eye. He testified as follows:

> Q. [COUNSEL FOR THE CHILDREN]: Can you control—you exposed the children. Can you not do the movie, not do the book? What is so important about those things? Why do they have to be done. Why can't the children's privacy be more important.

A. The children's privacy is important. I'm not saying it isn't.

(N.T., 10/5/94, p. 173.) Moreover, testimony is not required to establish the likelihood that the public dissemination of the children's difficult background, as well as the drug use of their parents, is extremely harmful. There can be no question that appellants' repeated exposure of every aspect of this case to any media outlet available was not in the best interests of the children.

As noted supra, the decision of the Derzacks which possibly caused the greatest harm to the children was the termination of court-ordered counseling and therapy. As the court found:

> The record of the trauma imposed upon Byron and Byrae from birth indicated that their being in counseling were necessary to maximize the children's chances for growing up to be normal functioning adults, free of trauma and mental disease. So critical was the need for the children to receive therapy, that the Court entered two Orders mandating therapy with Dr. Debra Klosterman for Byron and Byrae, with the expense of the therapy being paid by the Commonwealth.

(Slip Op. at 22.) Additionally, as noted, both appellants were aware that Byrae had been sexually abused. Nonetheless, they unilaterally decided to terminate court-ordered counseling, thereby placing their distrust of CYS over the needs of Byron and Byrae. Once again, it is clear that appellants' conduct in preventing desperately-needed professional care impacted negatively the best interests of the children.

Finally, as to appellants' failure to correct false information on the adoption application, the court found:

> The information contained in the Derzacks' application for consideration as a foster care family was one of the important factors used in selecting them as foster care parents for Byron.
>
> . . .
>
> This information gives important insight into the prospective foster care and adoptive parents' emotional and finan-

cial ability to maintain the child being entrusted to their care and must be answered truthfully, if the best interest of the child is to be served.

(Slip Op. at 28.) By misrepresenting mental health history and income, appellants placed the children at risk by failing to disclose factors which might notify CYS or the court that appellants were unable to provide sufficient emotional or financial support for the children. We reiterate that the court and CYS are ultimately responsible for the welfare of dependent children, and by lying to those authorities appellants acted contrary to the best interests of Byron and Byrae. As the court found, "providing false information relates directly, not only to the Derzacks' credibility, but also to their fitness to serve as adoptive parents [and therefore] the Derzacks do not meet the standard of fitness with regard to honesty and integrity required ... to qualify them as adoptive parents." (Slip Op. at 28.)

Since the conduct underlying the contempt citations adversely affected the best interests of the children, we agree with Juvenile Court that removal was warranted. Other factors also indicate that the best interests of the children are served by the removal Order. For instance, testimony of two police officers presented at the January 17, 1996 hearing revealed that Karen Derzack requested police assistance to locate her husband on two occasions. On both occasions Mrs. Derzack expressed her concern that Mr. Derzack, who left his residence in a vehicle, was intoxicated and suffering from stress (N.T., 1/17/96, pp. 32, 40). On the former occasion, Mr. Derzack did not return for more than two days (N.T. at 33). Further, the record reveals that on December 12, 1995, one day before the instant contempt proceeding, the Derzacks filed for personal bankruptcy claiming debts in excess of $540,000. This information, although not conclusive, provides additional support for Juvenile Court's finding that appellants are unable, either emotionally or financially, to adequately care for the children. Hence, we find no abuse of discretion in

the January 17, 1996 Order of Juvenile Court removing the children from the custody of appellants.

In closing, we note the following testimony of Mr. Derzack:

Q. [COUNSEL FOR THE CHILDREN]: In fact, you made some statements that when you believe that it was necessary or appropriate to disobey the Court order, you would do so; is that accurate?

A. Within the best interest of the children, yes.

(N.T., 10/5/94, p. 171.) For reasons that remain a mystery, this willingness to challenge not only the propriety of numerous court Orders, but also the authority of Juvenile Court to enter those Orders, became the mantra of appellants' strategy throughout the latter stages of this case. Having voluntarily initiated the adoption process, appellants thereafter defiantly and repeatedly refused to abide by the rules of that process. Unfortunately, in waging their battle against CYS and Juvenile Court, appellants lost sight of the needs of the children. On the record before us, we are unwilling to risk the possibility that appellants would do so again. The stakes are simply too high.

Based on all of the foregoing, we find that Juvenile Court had no choice but to order removal and alternative placement in an environment that will, at long last, serve the best interests of Byron and Byrae Griffin.[15]

Order affirmed.

---

**15.** We note that policy issues regarding interracial adoption and the concept of permanency planning are interlaced throughout the management of this case by CYS and Juvenile Court. However, these issues have not been considered herein since they are irrelevant to the resolution of this case.