J-A23010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | No. 545 MDA 2022 |

Appeal from the Order Entered March 10, 2022
In the Court of Common Pleas of York County Juvenile Division
at No(s): CP-67-DP-0000191-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: E.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | |
| | | No. 546 MDA 2022 |

Appeal from the Order Entered March 10, 2022
In the Court of Common Pleas of York County Juvenile Division
at No(s): CP-67-DP-0000188-2020

BEFORE:    BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:    **FILED: DECEMBER 28, 2022**

In this dependency matter, T.W.A. (Mother) appeals from the order entered March 10, 2022, in the York County Court of Common Pleas, finding her to be a perpetrator of child abuse[1] as to two of her children, B.W. (born

_____

[*] Former Justice specially assigned to the Superior Court.

[1] ***See*** 23 Pa.C.S. § 6303 (defining "perpetrator" as, *inter alia*, a parent who has committed child abuse against their child).

in May of 2014), and E.A. (El.A.,[2] born in August of 2019). Mother avers the trial court: (1) lacked jurisdiction to conduct the finding of abuse hearing, as she and Father had pending appeals from the goal change orders; and (2) erred in finding B.W.'s interview statements credible, where the court had not watched the video of the interview and another sibling, Ed.A., denied there was any abuse. We affirm.

## I. Introduction

In addition to B.W. and El.A., Mother and Father (collectively, the Parents) are the parents of Ed.A. (born in June of 2015), R.A. (June of 2018), and A.A. (June of 2021) (collectively, the Children). Both Parents have several appeals currently pending before this Court, as follows.

First, we summarize that on January 13, 2022, the trial court changed the permanency goals for all five Children from reunification to adoption. The Parents' appeals therefrom are pending before a different panel of this Court at Dockets 201 through 205 MDA 2022 (Father's appeals) and 295 through 299 MDA 2022 (Mother's appeals). As of this writing, those appeals are stayed pending the resolution of the Parents' other appeals.

---

[2] As Mother and E.A. (Father) have two children with the initials, "E.A.," we will refer to the child E.A. as "El.A." and the child, E.A., III, as "Ed.A."

As we discuss *infra*, Father's related appeal, from the order finding him a perpetrator of abuse against B.W. and El.A., is currently before this same panel at Superior Court Dockets 782 and 783 MDA 2022.

- 2 -

Meanwhile, on March 10, 2022, the trial court entered the underlying order, finding Mother was a perpetrator of abuse as to B.W. and El.A. This memorandum addresses that appeal. The trial court also made a finding of abuse against Father. However, he did not timely appeal, but instead filed petitions to reinstate his appeal rights *nunc pro tunc*. The trial court entered an order denying those petitions, and Father's appeal therefrom is currently pending before this same panel at Dockets 782 and 783 MDA 2022. We will dispose of his appeal separately.

Finally, on April 18, 2022, the trial court involuntarily terminated both Parents' rights to all five Children. Father's appeals therefrom are pending before this panel at Dockets 683 through 687 MDA 2022. Mother's appeals are pending at Dockets 755 through 759 MDA 2022. Counsel for El.A. and R.A. have also appealed, at, respectively, Dockets 740 and 741 MDA 2022.

## II. Facts & Procedural History

In August of 2020, York County Offices of Children, Youth, and Families (CYF) received a referral, which alleged Parents were using heroin and not properly supervising the four older children, B.W., Ed.A., R.A., and El.A., who were then six, five, two, and one year old. These children were adjudicated dependent on September 16, 2020. The trial court established the Children's permanency goal as return to parent, and conducted ongoing shelter care, status review, and permanency review hearings. A.A. was born in June of 2021 and was adjudicated dependent the following month, on July 12, 2021.

Meanwhile, on December 29, 2020, CYF received a Child Protective Services (CPS) referral as to the alleged physical abuse of B.W., then approximately six years old, by Mother and Father. N.T., 3/10/22, at 23. At the time, B.W. was residing in a foster home. *Id.* at 38-39. CYF conducted a "minimal facts" interview,[3] at which B.W. disclosed physical abuse by Mother and Father. *Id.* at 26.

On January 26, 2021, Lauren Carter, a forensic interviewer with the York County Children's Advocacy Center (CAC), conducted a forensic interview of B.W. *See* N.T., 3/10/22, at 10, 26. CYF Caseworker Marshall, as well as law enforcement, observed this forensic interview.[4] N.T., 3/10/22, at 27. B.W. disclosed he, as well as his siblings, were physically abused by both Parents. His statements led to a referral alleging the Parents' abuse of El.A.

At a status review hearing on November 10, 2021, the Parents averred the "the criminal investigation [of their alleged abuse] has been ongoing for quite some time[, but] has gone nowhere[.]" N.T., 11/10/21, at 8-9. The trial court directed CYF to conduct an independent investigation and to provide a finding of "indicated" or "unfounded" by the next hearing in three months' time. *Id.* at 8-9; Status Review Order, 11/10/21.

---

[3] CYF Caseworker Kristen Marshall described this interview as a focus on "who, what, when, where." N.T., 3/10/22, at 25.

[4] Caseworker Marshall explained that when CYF receives a CPS referral, CYF must notify the police. N.T., 3/10/22, at 27.

At the next permanency review hearing, on January 11, 2022, CYF reported it found both Mother and Father indicated as perpetrators of physical abuse against both El.A. and B.W., for causing bodily injury. N.T., 1/11/22, at 7. With respect to El.A. only, both Parents were also indicated for striking a child under the age of one. *Id.* at 6-7. On that same day, the trial court changed all the Children's permanency goals to adoption with the concurrent goals noted as return to parent or guardian.[5]

Next, on March 10, 2022, the trial court conducted a finding of abuse hearing. Mother and Father were present and represented by counsel, but did not testify. The Children were excused from attending the hearing, but were represented by a guardian *ad litem* and separate legal counsel. N.T., 3/10/22, at 4. The CAC forensic interviewer, Ms. Carter, testified: testified: "[B.W.] disclosed being beat — his words — that [El.A.] was slapped with a belt," Father beat R.A and El.A., Mother slapped B.W., and B.W. observed potential drug use. *Id.* at 12. B.W. further reported El.A. suffered injuries, including bleeding from the mouth. *Id.* at 13, 17.

CYF Caseworker Marshall, who observed the interview, testified:

[B.W.] disclose[d] that [he] and his siblings were being punished with . . . a black belt with little spikes on it. He reported that it was hurtful. [B.W.] actually stated it hurt more than a gun. He stated . . . the spikes were sharp and caused him to bleed. He stated he would cry and . . . and he was hit over and over. The

---

[5] As stated above, both Mother and Father have appealed from these goal change orders. *See* 201 through 205 MDA 2022; 295 through 299 MDA 2022.

very red marks like — were left like it was bleeding, but it wasn't. And he stated that both parents would hit him. . . .

N.T., 3/10/22, at 28-29.

CYF additionally entered into evidence the forensic interview summary[6] and a DVD video of the forensic interview. Ms. Marshall sought, but did not receive, medical records that might show physical injury to B.W.[7] **See** N.T., 3/10/22, at 31; Trial Ct. Op., 6/6/22, at 10. She also "attempted multiple times" to schedule an interview with Mother and Father, but was unsuccessful. N.T., 3/10/22, at 31-32.

With respect to El.A., Ms. Marshall testified that B.W. stated Mother and Father "sometimes . . . slapped [El.A.], so there was blood under his tongue,

_____

[6] Ms. Carter described a forensic interview summary as including:

> basic demographic information, [which persons were] present for the interview, who brought the child to the center, as well as who observed the interview. It includes who the alleged perpetrators are, a brief section about the child's functioning during the interview, and then a brief summary of what was said in the interview.

N.T., 3/10/22, at 11.

Furthermore, we note Mother attached numerous other documents as appendices to her appellate brief. However, this Court cannot consider them as they are not part of the certified record. **See Commonwealth v. Preston**, 904 A.2d 1, 6 (Pa. Super. 2006) (*en banc*) (appellate court may only consider materials present in the certified record).

[7] However, Caseworker Marshall stated she did obtain medical records for Ed.A. N.T., 3/10/22, at 32.

and that [El.A.] would cry a lot and neighbors would hear." N.T., 3/10/22, at 29. As stated above, B.W.'s statements led to a referral as to El.A. *Id.* at 32. "An investigation revealed [El.A. was] taken to the York Hospital emergency room for bleeding from the mouth in August 2019 when he was less than a month old." Trial Ct. Op., 3/4/22, at 3-4.

Finally, relevant to Mother's arguments in this appeal, we note that a forensic interview of another sibling, Ed.A. was conducted on the same day, January 26, 2021. This interview did not reveal any physical abuse against Ed.A., although there was "indication that physical abuse was occurring in the home[.]" N.T., 3/10/22, at 15. Neither this interview nor the ensuing summary report was presented as evidence at the finding of abuse hearing.

At the conclusion of the hearing, the trial court rendered a finding that both Mother and Father were perpetrators of abuse against B.W. and E.A. N.T., 3/10/22, at 53-54. Mother filed timely, counseled notices of appeal, along with Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal.[8] This Court *sua sponte* consolidated Mother's appeals.

---

[8] Although the trial court entered a single order containing separate captions for B.W. and El.A., Mother filed separate notices of appeal. She has thus complied with **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018) (when a single order resolves issues arising on more than one trial court docket, separate notices of appeal must be filed for each case), *overruled in part*, **Commonwealth v. Young**, 265 A.3d 462, 477 (Pa. Dec. 2021) (reaffirming that Pa.R.A.P. 341 requires separate notices of appeal when single order resolves issues under more than one docket, but holding Pa.R.A.P. 902
*(Footnote Continued Next Page)*

### III. Statement of Questions Involved & Standard of Review

On appeal, Mother presents the following issues for our review:

I. Whether the juvenile court erred as a matter of law and/or abused its discretion by making a finding of abuse despite [Pa.]R.A.P. 1701, which [precludes] the court from proceeding in the matter when there was already a pending appeal with the Superior Court.

II. Whether the juvenile court erred as a matter of law and/or abused its discretion when it accepted the testimony from B.W. made at the Children's Advocacy Center as credible despite admitting on the record that he had not yet watched the recording[?]

III. Whether the juvenile court erred as a matter of law and/or abused its discretion when it made the finding of abuse despite the testimony from B.W.'s sibling, [Ed.A.], which did not include those allegations[?]

Mother's Brief at 4 (suggested answers & some capitalization omitted).

At this juncture, we note the relevant standard of review:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***Interest of R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted).

_____

permits appellate court to consider appellant's request to remediate error when notice of appeal is timely filed).

## IV. Trial Court's Jurisdiction

In her first issue, Mother avers that pursuant to Pa.R.A.P. 1701, the trial court lacked jurisdiction to enter the March 10, 2022, finding of abuse, where she and Father had appeals pending from the January 13th goal change orders. Mother asserts the finding of abuse does not maintain the status quo or otherwise meet the exceptions at Subsection 1701(b). Mother's Brief at 12. Furthermore, as to Subsection 1701(c), Mother argues the entry of a finding of abuse is not separate from the dependency action, and in fact, the court cited the finding of abuse in its rationale for the goal change. *Id.* She also disputes the trial court's reliance on *In re Griffin*, 690 A.2d 1192 (Pa. Super. 1997), and reasons there was no emergent need for the Children's safety and welfare, as the allegations of abuse arose a year earlier and CYF had not promptly filed for a finding of abuse. Mother concludes the Superior Court had jurisdiction over this matter once she and Father appealed from the goal change orders. We disagree.

Pennsylvania Rule of Appellate Procedure 1701(a) provides that generally, once an appeal is taken, the trial court "may no longer proceed further in the matter." Pa.R.A.P. 1701(a). However, pursuant to Subsection 1701(b)(1), a court may, *inter alia*, take action "ancillary to the appeal." Pa.R.A.P. 1701(b)(1). Additionally, Subsection 1701(c), states: "Where only a particular item [or] claim. . . adjudged in the matter is involved in an

appeal, . . . the appeal . . . shall operate to prevent the trial court . . . from proceeding further with only such item [or] claim[.]" Pa.R.A.P. 1701(c).

In *In re Griffin*, the foster parents argued the juvenile court lacked jurisdiction to find them in contempt of a prior order and to remove the dependent children from their care, on the ground there were two pending appeals before the Superior Court (the biological mother's appeal from the termination of her parental rights and the biological great aunt's appeal from an order returning the children to the foster parents' home). *In re Griffin*, 690 A.2d at 1197, 1199. This Court disagreed, reasoning that under Rule 1701(c), the contempt order against the foster parents was not relevant to the subject orders of the appeals — the termination of the mother's parental rights and the removal of the children from their great aunt's care. *Id.* at 1199. Pertinently, this Court also reasoned:

> Were we to accept [an] argument that Juvenile Court is deprived of jurisdiction once an appeal of any aspect of a dependency action is filed, we would render the court powerless to prevent any abuse, no matter how egregious, of a dependent child at the hands of his custodian. Most dependency actions, and especially those as prolonged as the one currently at issue, involve a variety of issues, parties and Orders of court. A holding that deprives Juvenile Court of jurisdiction merely because a single Order, involving any issue or party, has been appealed would not only defy logic, but it would also frustrate the statutory authority of Juvenile Court to exercise continuing independent and original authority to adjudicate in the best interests of a dependent child.

*Id.* at 1200 (citation omitted).

In *In re R.P.*, 956 A.2d 449 (Pa. Super. 2008), the trial court found the parents were perpetrators of abuse against their child, declared both their

children to be dependent, and directed that no reunification efforts were required. *Id.* at 451. While the mother's appeal from this order was pending in the Superior Court, the trial court conducted a permanency review hearing and directed the agency to file a petition to terminate the parents' parental rights. *Id.* at 452. On appeal from this latter order, the parents argued the trial court lacked jurisdiction, under Pa.R.A.P. 1701(a), to proceed further in the dependency matter while the prior appeal to this Court was pending. *Id.* at 453.

This Court disagreed, citing, *inter alia*, **Griffin**, 690 A.2d 1192. **In re R.P.**, 956 A.2d at 453-54. This Court also considered:

> In order to avoid gamesmanship, and because of the time needed for appellate review, all orders denying goal changes or termination of parental rights will remain in effect until overturned on appeal or rendered moot by a subsequent order. However, all statutory review hearings should continue at the prescribed intervals; generally, a stay should not be ordered and proceedings halted pending the appeal. As the best interest of the children is always paramount, the continued finger of the trial court on the pulse of the case is needed, even while the matter is appealed.

*Id.* at 453, *quoting* **Interest of H.S.W.C.-B**, 836 A.2d 908, 911 (Pa. 2003) (emphasis removed).

Here, the trial court determined that pursuant to Rule 1701(c), the finding of abuse was distinct from the main dependency matter, because they addressed different issues. Trial Ct. Op., 6/6/22, at 5. First, the court reasoned its goal change order was premised on the best interests of the Children, taking into account: (1) the fact the four older children had been in

placement for more than 15 months; (2) remaining concerns as to the Parents' "ability to provide a stable home and to meet the financial burden of caring for five minor children[;]" and (3) the Parents' history of instability with late rent, shut-off utilities, and "lack of adequate documentation [for CYS] to assess income, expenses, and employment." *Id.* In entering a goal change, the trial court did consider "B.W.'s disclosure which was indicated as to both [P]arents as well as the receipt of five new CPS referrals which would have to be investigated." *Id.* at 5-6.

On the other hand, the trial court summarized, "[t]he finding of abuse hearing addressed a separate matter from the change of goal[, and] focused on the disclosures of abuse made by B.W." Trial Ct. Op., 6/6/22, at 6. The court reasoned: "Because this was a different matter than the change of goal, the [c]ourt retained jurisdiction as permitted by [Rule] 1701(c)[.]" *Id.*

We agree with the trial court that, under Rule 1701, the finding of abuse is ancillary to and separate from the determination as to goal change. *See* Pa.R.A.P. 1701(b)(1), (c). With respect to a goal change, a court must look to the best interests of the child:

> Pursuant to [42 Pa.C.S.] § 6351(f)[ ] of the Juvenile Act,[9] when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances

---

[9] 42 Pa.C.S. §§ 6301-6375.

which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. . . .

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations omitted).

On the other hand, with respect to a finding of abuse under the Child Protective Services Law,[10] "[t]he purpose of the [CPSL] is to bring about quick and effective reporting of suspected child abuse[, to promote] providing protective services competently and to prevent further abuse of the children while providing rehabilitative services for them and the parents." *Interest of J.R.W.*, 631 A.2d 1019, 1023-24 (Pa. Super. 1993), *citing* 23 Pa.C.S. § 6302(b).

We are also guided by *In re Griffin* and *In re R.P.* Although the underlying order of this appeal (a finding of abuse) differs from those in *Griffin* (finding the foster parents in contempt) and *In re R.P.* (directing the agency to file termination petitions), the rationale and policy considerations in those decisions apply here. Were we to accept Mother's argument, that the trial court was deprived of jurisdiction once she took the prior appeal, the trial court would be "powerless to prevent any abuse, no matter how egregious, of" the dependent children. *See In re Griffin*, 690 A.2d at 1200. We

---

[10] 23 Pa.C.S. §§ 6301-6388.

- 13 -

emphasize Mother has presented no argument why allowing the finding of abuse of proceedings to continue, notwithstanding her prior appeal, would infringe on the children's best interests. *See In re R.P.*, 956 A.2d at 453 ("As the best interest of the children is always paramount, the continued finger of the trial court on the pulse of the case is needed, even while the matter is appealed."). Accordingly, no relief is due on Mother's jurisdictional challenge.

## V. Finding of Abuse

Mother's last two issues challenge the trial court's credibility determinations in concluding she is a perpetrator of abuse. We first review the following relevant legal authority. We reiterate that under our standard of review, we review for an abuse of discretion, and are required "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *Interest of R.J.T.*, 9 A.3d at 1190.

> We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

> [W]e must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon. . . . Even if an appellate court would have made a different conclusion based on the cold record, we are not

in a position to reweigh the evidence and the credibility determinations of the trial court. . . .

**Interest of R.J.T.**, 9 A.3d at 1190.

This Court has explained:

While dependency proceedings are governed by the Juvenile Act . . . the Child Protective Services Law . . . pertains to a court's finding of "child abuse," which must be supported by clear and convincing evidence. [A]s "part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

**Interest of X.P.**, 248 A.3d 1274, 1276 (Pa. Super. 2021) (citations omitted).

The CPSL defines child abuse, in relevant part, as follows:

**(b.1) Child abuse.** The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent act or failure to act.

\* \* \*

[(8)(iv)] Forcefully slapping or otherwise striking a child under one year of age. . . .

23 Pa.C.S. § 6303(b.1)(1), (8)(iv). Bodily injury, in turn, is defined as "[i]mpairment of physical condition or substantial pain."[11] 23 Pa.C.S. § 6303(a).

---

[11] Furthermore, with respect to the definitions of intentionally, knowingly, and recklessly, the definitional section of the CPSL refers to 18 Pa.C.S. § 302(b), which provides as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

*(Footnote Continued Next Page)*

- 15 -

For ease of review, we next set forth the following relevant testimony from the finding of abuse hearing. The CAC forensic interviewer, Ms. Carter, testified B.W. was able to distinguish the difference between a truth and a lie, and he appeared to have normal cognitive functioning. N.T., 3/10/22, at 10, 14. Ms. Carter testified that B.W. disclosed: he and El.A. were "being beat;" Mother slapped him; El.A. "was slapped with a belt;" Father "beat" R.A.; and Mother slapped both El.A. and R.A. *Id.* at 12. With respect to whether B.W. had been "coached" ahead of the interview, Ms. Carter denied it was "her job

---

      (i) . . . it is his conscious object to engage in conduct of that nature or to cause such a result; and

      (ii) . . . he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly . . . when:

      (i) . . . he is aware that his conduct is of that nature or that such circumstances exist; and

      (ii) . . . he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly . . .when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

*See* 18 Pa.C.S. § 302(b)(1)-(3); 23 Pa.C.S. § 6303(a).

to determine if someone's being coached[,]" and instead, she merely "gather[ed] information." *Id.* at 19. While she could not say whether B.W. had been coached, she did not "recall anything that would [suggest] that during [B.W.'s] interview." *Id.* at 14, 19. Finally, Ms. Carter conceded she last reviewed the video of the interview 14 months earlier, but confirmed her written summary of the interview was accurate. *Id.* at 13, 18. Ms. Carter also stated that in Ed.A.'s separate forensic interview that same day, Ed.A. revealed: there **was** "physical abuse occurring in the home[;]" but there was no indication either parent was slapping the children or hitting them with belts. *Id.* at 14.

CYF Caseworker Marshall, who observed the forensic interview, corroborated Ms. Carter's summary of B.W.'s statements. *See* N.T., 3/10/22, at 12-13, 28-29. Caseworker Marshall summarized that B.W. disclosed he and his siblings "were punished with . . . a black belt with little spikes[,]" which were "sharp and caused him to bleed." *Id.* at 28-29. The caseworker also stated she believed B.W.'s statements. *Id.* at 43.

Finally, in denying a request to play, in court, the video of B.W.'s forensic interview, the trial court stated, "I don't believe I've viewed it, or if I did, it was so long ago I don't remember, and I may view it yet, but I don't see any reason to play it in open court. That's not going to accomplish anything. Counsel have already seen it, they've asked their questions, we have the

summary." N.T., 3/10/22, at 21-22. We now turn to Mother's arguments on appeal.

In Mother's second issue, she alleges that where the trial court acknowledged on the record it had not viewed the recording of the interview, the court erred in finding B.W.'s statements credible. Mother's Brief at 14-15. Mother contends the trial court improperly "left the decision of credibility to the [CAC forensic] interviewer," who acknowledged "she was merely a fact gatherer, and [was] not able to determine if [B.W.] was coached or credible." *Id.* at 15-16. The interviewer also had not, at the time of the finding of abuse hearing, watched the video in 14 months. *Id.* at 15. Mother maintains that in the interview, B.W.: stated his foster mother had told him about the interview; "rattled off a list of facts as soon as the interviewer asked if there was anything she should know[;]"gave inconsistent testimony, where he stated, "[M]ommy never hits me[;]" and made statements that contradicted those of Ed.A. *Id.* at 16. Mother avers the court similarly erred in deferring to the credibility assessments of CYF Caseworker Marshall, who had "ignored multiple hospital reports [showing they had] low concern of child abuse[.]" *Id.* at 14.

In her third issue, Mother contends the trial court erred in finding she was a perpetrator of abuse, in light of the fact that Ed.A. did not, in his separate forensic interview, make any allegations of abuse. *See* Mother's Brief at 18. Mother asserts the court also failed to watch the forensic interview

of Ed.A., and thus improperly found B.W. credible. Therefore, she again argues the court "substituted the credibility determinations [by] third-party sources as its own." *Id.* at 17. We conclude no relief is due.

Here, the trial court addressed Mother's claims as follows:

The Court admitted B.W.'s CAC [forensic] interview pursuant to [42] Pa.C.S. § 5986 and found the child's disclosures were credible. The judge[12] indicated that he did not believe he had watched the video or if he had, it was so long ago that he did not recall. However, a court may rely upon properly admitted evidence. The CAC summary of [B.W.'s] statements had been previously admitted for the Court's review.

Further, the [c]ourt took testimony from the CAC interviewer, Lauren Carter, who was able to speak to issues such as B.W.'s truthfulness. [Ms. Carter testified that: B.W. was able to distinguish the difference between the truth and a lie; she was able to understand B.W.; and B.W. drew a picture and made a writing.]

Trial Ct. Op., 6/6/22, at 7 (record citations omitted & paragraph break added).

The trial court also considered the testimony of CYF Caseworker Marshall. According to the trial court, she was unable to obtain medical records for B.W., but did get medical records for El.A., which "indicated [he] was seen for unexplained bleeding from the mouth when less than a month old." Trial Ct. Op., 6/6/22, at 10. Ms. Marshall also attempted "multiple times" to schedule interview with the Parents, but they did not respond. *Id.* at 10. The court concluded:

_____

[12] We note the same judge, the Honorable Christopher Menges, presided over the finding of abuse hearing and authored the trial court opinion.

> Based on the testimony and the evidence, it was within the Court's discretion to accept B.W.'s testimony as credible. The Court knows of no authority and [Mother] cites none that would require a court to discount the credibility of a child who discloses abuse based on the fact that a sibling did not disclose abuse.

*Id.* at 11.

Upon review, we find no abuse of discretion. Mother's arguments essentially seek to have this Court re-weigh the evidence and supplant the trial court's credibility determinations with our own. This we cannot do. **See Interest of R.J.T.**, 9 A.3d at 1190; **In re M.G.**, 855 A.2d at 73-74. As the record supports the trial court's finding of abuse, we do not disturb the court's credibility determinations and determinations as to weight of the evidence. Finally, Mother's reliance on the statements made in Ed.A.'s forensic interview is meritless, as neither the video of that interview nor the written summary was admitted into evidence. We conclude Mother's second and third claims are without merit.

## VI. Conclusion

For the foregoing reasons, we find no merit to Mother's claims. We affirm the trial court's order finding Mother was a perpetrator of abuse with regard to B.W. and El.A.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2022