J-A14037-25

2025 PA Super 189

| | | |
|---|---|---|
| IN THE INTEREST OF: R.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 383 EDA 2025 |

Appeal from the Order Entered January 9, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001350-2014

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY FORD ELLIOTT, P.J.E.:                **FILED AUGUST 29, 2025**

D.D. ("Foster Mother") appeals, *pro se*, from the January 9, 2025 order that terminated the trial court's supervision of R.P., born December 2003, and ended the custody and responsibilities of the Philadelphia Department of Human Services ("DHS" or "the Agency").  Foster Mother challenges the trial court's discharge of its supervision of R.P.'s dependency without adequately addressing his transitional needs and further challenges the court's conclusion she was willing to house R.P. at her own expense and without DHS's support. After careful consideration, we vacate and remand with instructions.

We gather the relevant factual and procedural history of this matter from the certified record.  DHS first became involved with R.P. on June 4, 2014, when it assumed emergency custody of him from E.P. ("Adoptive

_____

[*] Retired Senior Judge assigned to the Superior Court.

Mother") due to concerns about excessive discipline and insufficient nutrition.[1]

On June 19, 2014, the trial court adjudicated R.P. dependent. On June 18, 2015, Adoptive Mother voluntarily relinquished her parental rights. R.P.'s permanency goal was subsequently changed to adoption.

R.P. has been in perpetual placements since he was removed from Foster Mother's care at the age of ten years old. Beginning in March 2017, he began exhibiting behavioral and mental health issues that resulted in his transfer to treatment foster care. In May 2017, R.P. was moved, again, to respite care. R.P. was committed for in-patient treatment at a Philadelphia-based facility from August 2017 until December 2017. Upon discharge, R.P. was placed in a residential treatment facility where he remained until he was moved to a group home administered by Carson Valley Children's Aid ("CVCA") in April 2019. Thereafter, R.P. remained at a succession of CVCA facilities for nearly five years. During these proceedings, he was diagnosed with, *inter alia*, autism and bipolar disorder.

Since turning eighteen years old in December 2021, R.P. has continued under court supervision pursuant to a youth board extension executed prior to his eighteenth birthday. ***See, e.g.***, Permanency Review Order, 11/12/21, at 2 (ordering DHS "to ensure that the youth board extension is signed"). He has struggled in both maintaining steady employment and attending

---

[1] The certified record is entirely silent regarding the circumstances under which R.P. entered Adoptive Mother's care, or the first ten years of his life.

community college.  His behavioral issues have also persisted.  *See* Resource Family Reporting Form, 1/9/25, at 2 (reporting that R.P. is "emotionally unstable," has "difficulty adjusting" to situations, and experiences angry outbursts).

At the time he entered Foster Mother's custody in approximately January 2024, R.P. was twenty years old.  At that time, R.P.'s DHS services were being administered through the community umbrella agency, Caring People Alliance ("CPA").  R.P. turned twenty-one years old in December 2024.

On January 9, 2025, the trial court held a permanency review hearing, wherein the Agency presented testimony from CPA case manager Shawn Miles and CPA supervisor Eric Hawkins.  R.P. was present and represented by counsel.  Foster Mother was also present and testified.  In pertinent part, she detailed the ongoing struggle to navigate R.P.'s post-dependency service providers.  *See id.* at 24-30.  She also averred she could not continue caring for R.P. if court supervision was ended, since he and the Agency had not finished navigating his entitlements to services through, *inter alia*, the Lifesharing program, supplemental Social Security income ("SSI"), a waiver for in-home services through Intellectual Disability Services ("IDS"), mental health treatment through the Joseph J. Peters Institute ("JJPI"), and the Office of Vocational Rehabilitation ("OVR").  *See id.* at 31-33.

At the conclusion of the hearing, DHS asserted that the court lacked jurisdiction due to R.P.'s age.  *See id.* at 34.  In contrast, R.P.'s child advocate argued: "I think that this is a case that warrants additional oversight."  *Id.*

Ultimately, the court indicated on the record that it believed that it lacked jurisdiction due to R.P.'s age. *See id.* at 35. The same day, it filed an order holding that "[c]ourt-ordered services from [DHS] are no longer needed" and discharged R.P. from the Agency's supervision and custody. Order for Termination of Court Supervision, 1/9/25, at 1. The order also noted: "[Foster Mother] is willing to let [R.P.] stay at her home." *Id.*

On February 10, 2025, Foster Mother timely submitted a *pro se* notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b).[2] On March 10, 2025, the trial court submitted a Rule 1925(a)(2)(ii) opinion finding that Foster Mother did not have standing to appeal since she was not a party in the underlying dependency proceedings. *See* Trial Court Opinion, 3/10/25, at 1-3. The court also suggested that Foster Mother's appellate claims were moot. *See id.* at 4. Finally, the court reiterated its conclusion that it lacked jurisdiction in this case due to R.P.'s age. *See id.* at 3-5.

Generally, the standard of review in dependency cases is for an abuse of discretion insofar as the appellate court must accept the trial court's findings of fact and credibility determinations if supported by the record, but need not

---

[2] The final day in which a party was entitled to appeal the trial court's order was February 8, 2025, which was a Saturday. *See* Pa.R.A.P. 903(a). Since that day coincided with a weekend, it and the following Sunday were "omitted" pursuant to 1 Pa.C.S.A. 1908 ("Computation of time"). Thus, Foster Mother's filings on Monday, February 10, 2025, were timely. *See Interest of T.G.*, 332 A.3d 80, 86 n.1 (Pa. Super. 2025).

accept the court's inferences or conclusions of law. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). To the extent the instant case involves questions pertaining to standing, jurisdiction, and the proper interpretation of statutes and the Pennsylvania Rules of Juvenile Court Procedure, our standard of review is *de novo* and our scope of review is plenary. *See In re Adoption of A.M.W.*, 289 A.3d 109, 116 (Pa. Super. 2023) ("Issues of standing generally raise pure questions of law for which we employ *de novo* review of a trial court's decision."); *Interest of J.M.*, 219 A.3d 645, 650 (Pa. Super. 2019) ("Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review is plenary."); *Interest of K.P.*, 199 A.3d 899, 901 (Pa. Super. 2018) (claims requiring this Court to interpret Juvenile Act and Rules of Juvenile Court Procedure present questions of law for which standard of review is *de novo* and scope of review is plenary).

Further,

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). The plain language of the statute is generally the best indicator of legislative intent, and the words of a statute "shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). We generally look beyond the plain language of the statute only where the words are unclear or ambiguous, or the plain meaning would lead to "a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922.

*In re C.L.P.*, 126 A.3d 985, 989 (Pa. Super. 2015) (some citations omitted).

In construing the Pennsylvania Rules of Juvenile Court Procedure,[3] as they are adopted by the Pennsylvania Supreme Court, the principles set forth in the Pennsylvania Rules of Judicial Administration 105 to 115 govern, "unless the application of such principles would result in a construction inconsistent with the manifest intent of the Supreme Court." Pa.R.J.A. 104. Among those rules of construction is the presumption that "[t]he Supreme Court intends a rule to be construed to secure the just, speedy, and inexpensive determination of every action or proceeding to which it is applicable." Pa.R.J.A. 109(b). Further, "[e]very rule shall be construed, if possible, to give effect to all its provisions. When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Pa.R.J.A. 108(b). Also, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and [those with] peculiar [] meaning or as are expressly defined by rule shall be construed according to such peculiar [] or express meaning or definition." Pa.R.J.A. 106(a). Moreover, "[r]ules in *pari materia* in the same body of rules shall be construed together, if possible, as one rule or one chapter of rules." Pa.R.J.A. 112.

We will begin by addressing together both the trial court's findings that: (1) Foster Mother lacked standing to appeal pursuant to Pennsylvania Rule of

---

[3] **See** Pa.R.J.C.P. 101(c) ("In the construction of the Pennsylvania Rules of Juvenile Court Procedure, the principles set forth in [the Pennsylvania Rules of Judicial Administration] 104 to 115 shall be observed.").

Appellate Procedure 501 and; (2) the case is moot. Specifically, as to standing, the court reasoned that Foster Mother "has never been a party to R.P.'s dependency matter" and, thus, "does not have standing" to appeal its January 9, 2025 order. Trial Court Opinion, 3/10/25, at 1 (citing Pa.R.A.P. 501 ("Except where the right to appeal is enlarged by statute, any party who is aggrieved by an appealable order [. . .] may appeal therefrom.")). As to mootness, the court equated mootness with its analysis of jurisdiction on the merits (as discussed further below) and found that because it lacked jurisdiction to act further, the case is moot. **See** Trial Court Opinion, 3/10/25, at 4-5 (opining appeal is moot because court lacks jurisdiction to act further).

The trial court raised these questions regarding Foster Mother's standing and mootness *sua sponte*, which is prohibited under Pennsylvania law. **See Rendell v. Pennsylvania State Ethics Comm'n**, 983 A.2d 708, 717 (Pa. 2009) (explaining that standing, ripeness, and mootness may not be raised by courts *sua sponte*); **see also In re Nomination Petition of Jordan**, 277 A.3d 519, 529 (Pa. 2022) (same). This prohibition has specifically extended to the application of Rule 501. **See U.S. Bank Tr. Nat'l Ass'n as Trustee of Lodge Series III Trust v. Unknown Heirs Under Brolley**, 278 A.3d 310, 314 n.2 (Pa. Super. 2022) (holding that even where certified record indicates that party has no "interest" in appeal, we may not *sua sponte* quash appeal pursuant to Rule 501).

Instantly, after our review of the certified record, we observe that no party or participant independently raised standing or mootness; therefore, the

- 7 -

court's determinations concerning Foster Mother's standing under Rule 501 and the case being moot were inappropriately raised *sua sponte*.[4]  **See Rendell**, 983 A.2d at 717; **see also Petition of Jordan**, 277 A.3d at 529. Accordingly, we may proceed to address the merits of Foster Mother's appellate claims.

In turning to the merits of her claims, in her *pro se* brief, Foster Mother challenges the trial court's discharge of its supervision of R.P.  **See** Foster Mother's Brief, at 1-7.  The crux of Foster Mother's arguments is that DHS sought discharge of dependency in this case without adequately addressing

_____

[4]  Further, and in any event, we conclude Mother qualified as an aggrieved party for the purposes of Rule 501.  We note that this Court has found that an appellant who was "not a named party" in a custody action qualified as an "aggrieved party" under Rule 501 due to her participation and "indispensable" involvement in the case.  **See Walker v. Walker**, 523 A.2d 782, 783 (Pa. Super. 1987).  Accordingly, to the extent that the trial court found that Foster Mother could not appeal simply because she is not a formal party in the dependency proceedings, our case law does not support such a strict conclusion.  **See id.**  Indeed, Foster Mother participated in the proceedings, and the trial court's rulings necessarily implicated her by placing R.P. in her home; the certified record reflects that R.P. was, in essence, surrendered to Foster Mother's care by virtue of the trial court's ruling, which forced Foster Mother to choose between the unenviable alternatives of finishing R.P.'s transitional planning on her own or simply abandoning R.P. to homelessness. **Cf. Epstein v. Saul Ewing, LLP**, 7 A.3d 303, 314 (Pa. Super. 2010) ("A party is aggrieved by a ruling when that party has been adversely affected by the decision from which the appeal is taken."); **In re McCune**, 705 A.2d 861, 864 (Pa. Super. 1997) ("An aggrieved party must have a substantial interest at stake," which surpasses "the common interest of all citizens in procuring obedience to the law.").  Accordingly, we conclude that Foster Mother is aggrieved insofar as the court placed R.P. in her home, without the required statutory transition plans in place, as discussed further below.

R.P.'s transitional needs.[5]  ***See id.***  In particular, Foster Mother argues that the court terminated its supervision without ensuring that a plan was in place with respect to R.P.'s housing, income, and in-home services.  ***See id.*** (indicating that R.P. risks homelessness and deprivation due to lack of clarity and preparation prior to termination of court supervision).  Finally, she also challenges the court's conclusion she is willing to permit R.P. to continue living with her under these conditions.  ***See id.***

In response to the merits of Foster Mother's claims, the court found it lacked jurisdiction.  ***See*** Trial Court Opinion, 3/10/25, at 3-4 ("The trial court terminated court supervision for R.P. as there was no longer jurisdiction over the matter.  [. . .] R.P. reached the age of 21 [in December 2024].").  By way of legal support, the court found that R.P. no longer falls within the statutory

_____

[5]  Foster Mother's brief is generally non-compliant with the strictures of the Pennsylvania Rules of Appellate Procedure regarding the formatting and structure of appellate briefs.  ***See generally*** Pa.R.A.P. 2111-88.  Pursuant to Pennsylvania Rule of Appellate Procedure 2101, we have the discretion to quash or dismiss appeals due to "substantial" defects in an appellant's brief. Pa.R.A.P. 2101.  We emphasize, however, that quashal for non-compliance with Rule 2101 "is not mandatory."  ***Fulano v. Fanjul Corporation***, 236 A.3d 1, 12, (Pa. Super. 2020).  We are also mindful that this Court construes *pro se* filings liberally.  ***See In re deLevie***, 204 A.3d 505, 511 (Pa. Super. 2019). Although we pointedly remind Foster Mother of her obligation to substantially comply with our rules of procedure, her defective brief has not hampered our review.  Thus, we will examine Foster Mother's arguments on their merits. ***See id.***; ***see also, e.g.***, ***Fulano***, 236 A.3d at 12 (declining to quash appeal pursuant to Rule 2101 where underlying defects did not "substantially" impede review).

definition of "[c]hild" that applies in dependency proceedings pursuant to 42 Pa.C.S. § 6302. **See id.** at 4.

It is beyond cavil that R.P. no longer falls within the Juvenile Act's technical definition of a child. **See** 42 Pa.C.S. § 6302 (indicating that "child" is individual who is under age of twenty-one and meets certain criteria). Tellingly, however, nothing in Section 6302 suggests that a trial court in a dependency proceeding is automatically and irrevocably stripped of jurisdiction as soon as the subject individual turns twenty-one years old.

Once a child has been declared dependent, the trial court "'maintains a continuing plenary jurisdiction in dependency cases[.]'" **Interest of J.M.**, 219 A.3d 645, 658 (Pa. Super. 2019) (quoting **In re Tameka M.**, 580 A.2d 750, 752 (Pa. 1990)). Indeed, a court in this context possesses "independent and original authority to adjudicate in the best interests of a dependent child." **In re Griffin**, 690 A.2d 1192, 1200 (Pa. Super. 1997). We are unaware of any legal authority suggesting that jurisdiction in dependency cases expires based upon the age of the participants as suggested by the trial court, *i.e.*, by operation of law and without regard to the circumstances of the case.

Contrary to the trial court's finding, the conclusion of court supervision in dependency proceedings is governed by Pennsylvania Rule of Juvenile Court Procedure 1631, which provides, in pertinent part, as follows:

**Rule 1631. Termination of Court Supervision**

**(a) Concluding Supervision.** Any party, or the court on its own motion, may move for the termination of supervision when court-

ordered services from the county agency are no longer needed and:

\* \* \* \*

(10) the child is 18 years of age or older and a hearing has been held pursuant to subdivision (e);

\* \* \* \*

**(c) Objection.** Any party may object to a motion under subdivision (a) and request a hearing.

**(d) Hearing.** If objections have been made under subdivision (c), the court shall hold a hearing and give each party an opportunity to be heard before the court enters its final order.

**(e) Children 18 Years of Age or Older.**

(1) Before the court can terminate its supervision of a child who is 18 years of age or older, a hearing shall be held at least 90 days prior to the child turning 18 years of age.

(2) Prior to the hearing, the child shall have the opportunity to make decisions about the transition plan and confer with the county agency about the details of the plan. The county agency shall provide the transition plan to the court and the plan shall, at a minimum, include:

   (i) the specific plans for housing;

   (ii) a description of the child's source of income;

   (iii) the specific plans for pursuing educational or vocational training goals;

   (iv) the child's employment goals and whether the child is employed;

   (v) a description of the health insurance plan that the child is expected to obtain and any continued health or behavioral health needs of the child;

(vi) a description of any available programs that would provide mentors or assistance in establishing positive adult connections;

(vii) verification that all vital identification documents and records have been provided to the child;

(viii) a description of any other needed support services;

(ix) a list, with contact information, of supportive adults and family members; and

(x) notice to the child that the child can request resumption of juvenile court jurisdiction until the child turns 21 years of age if specific conditions are met.

(3) At the hearing, the court shall review the transition plan for the child. If the court is not satisfied that the requirements of subdivision (e)(2) have been met, a subsequent hearing shall be scheduled.

(4) **The court shall not terminate its supervision of the child without approving an appropriate transition plan**, unless the child, after an appropriate transition plan has been offered, is unwilling to consent to the supervision and the court determines termination is warranted.

**(f) Cessation of Services.** When all of the above listed requirements have been met, the court may discharge the child from its supervision and close the case.

Pa.R.J.C.P. 1631(a), (c)-(f) (emphases added).

The ground for termination of court supervision implicated in this case is Rule 1631(a)(10), which concerns individuals over the age of eighteen. *See* Pa.R.J.C.P. 1631(a)(10).[6] Rule 1631(e) further governs the requirements for

_____

[6] None of the additional grounds for termination of court supervision appear to be applicable in this case. *See* Pa.R.J.C.P. 1631(a)(1)-(9), (11)-(13).

termination of court supervision in dependency proceedings involving an individual over the age of eighteen.  *See* Pa.R.J.C.P. 1631(a)(10), (e).  In pertinent part, the Agency must prepare and file a transition plan incorporating the decision-making and input of the subject person.[7]  ***See*** Pa.R.J.C.P. 1631(e)(2).  The transition plan must, at a minimum, address and document several vital considerations concerning the dependent's transition into self-sustained life by virtue of the end of the individual's court supervision, including, *inter alia*:  (1) specific housing plans following discharge from dependency; (2) a description of any income sources; (3) specific plans for educational and vocational goals; (4) employment goals and status; (5) a description of the individual's continued medical and behavioral health needs; and (6) a description of any other needed support services.[8]  ***See*** Pa.R.J.C.P. 1631(e)(2)(i)-(v), (viii).

_____

[7]  At the statutory level, the Agency has a general mandate to "provide age and developmentally appropriate services" to help dependent children "prepare for eventual adulthood."  67 Pa.C.S. § 7505(a)(1).  To that end, the Agency must "develop a transition plan in collaboration with the child," beginning "no less than six months before the child will become 18 years of age[.]"  67 Pa.C.S. § 7505(a)(2).  The Agency is also required to "document the child's transition plan in the child's case plan" and "retain electronic copies of the transition plan" for "no less than five years after termination of court supervision."  67 Pa.C.S. § 7505(c).

[8]  Pennsylvania law also requires that the Agency-prepared transition plan includes:  (1) detailed information regarding the child's "options for a suitable place of intended residence;" (2) contact information of supportive adults and family members; (3) identification of "local opportunities" for mentorship and social support; (4) "detailed options" for employment, job training, or

*(Footnote Continued Next Page)*

Thereafter, the court is required to "review the transition plan" and ensure that the Agency has satisfied these requirements. Pa.R.J.C.P. 1631(e)(3). If the Agency has failed to produce an "appropriate transition plan," the court is required to schedule a "subsequent hearing" to allow time for supplemental action and revision by the Agency. *See id.* The court cannot "terminate its supervision" without "approving an appropriate transition plan[.]" Pa.R.J.C.P. 1631(e)(4). The court can only discharge the person from its supervision after "all of the above listed requirements have been met[.]" Pa.R.J.C.P. 1631(f).

After our review, applying the plain meaning of the language of the applicable rules and statutes discussed above, we readily conclude that the trial court did not follow the appropriate procedures for termination of its supervision in this case. *See* Pa.R.J.A. 108(b), 106(a); *In re C.L.P.*, 126 A.3d at 989. Here, the certified record reflects that the trial court first contemplated the discharge of R.P.'s dependency in March 2024, when it directed that "[d]ischarge planning" was to "start forthwith." Permanency Review Order, 3/8/24, at 2. This process was still underway in July 2024, when the court further ordered DHS to "[c]ontinue with [t]ransitional [p]lanning." Permanency Review Order, 7/24/24, at 1. Thereafter, there is no mention of a transition plan. On October 17, 2024, the court directed that

_____

continuing education; and (5) documentation of the child's possession of relevant documents. 67 Pa.C.S. § 7505(b)(1)-(5).

"a [d]ischarge [p]lanning [m]eeting" was to occur "prior" to the next court date. Permanency Review Order, 10/17/24, at 2. The order also noted that "[n]o exhibits were presented to the court." *Id.*

We observe that although the discharge planning meeting took place on January 8, 2025, there is scant information in the certified record detailing who attended or what was discussed. *See* N.T. Dependency Hearing, 1/9/25, at 18-19 (indicating only that Foster Mother was present for the discharge planning meeting and requested that court supervision be extended for transitional purposes). On that limited record, the court terminated its supervision. *See* Order for Termination of Court Supervision, 1/9/25, at 1-2. In sum, the record fails to establish that R.P.'s transition plan was finalized or ratified by the court as required by the rules; under these circumstances, we conclude that the court did not fulfill the mandatory prerequisites for terminating its supervision of this matter. *See* Pa.R.J.C.P. 1631(e)(4), (f). Instead, the court was required to schedule a "subsequent hearing" and require the Agency to present an appropriate plan that fully addressed the necessary issues. Pa.R.J.C.P. 1631(e)(3). Indeed, sufficient grounds for termination of court supervision cannot exist in this case until **after** the requirements of Rule 1631(e) have been fulfilled. *See* Pa.R.J.C.P. 1631(a)(10) (indicating that termination based upon child being over age of eighteen is only appropriate when a "hearing" pursuant to Rule 1631(e) is properly completed).

We note that the trial court's procedural errors were not merely formalistic, but were substantive, which detrimentally deprived R.P. of his statutory rights; the record indicates that significant questions remained at the time of discharge regarding R.P.'s future housing, income, education, employment, health needs, and support services. It is clear from the permanency review orders entered between March 2024 and October 2024 that CPA was attempting to connect R.P. with numerous resources, which included, *inter alia*, housing support through the Lifesharing program, SSI, an IDS in-home waiver, and additional services through JJPI and OVR. There were, however, ongoing problems with these transitional planning efforts, and the record reflects that the plans were not yet finalized.

Specifically, Foster Mother testified that R.P. had been unsuccessfully referred to three different providers through Lifesharing.[9] **See** N.T. Dependency Hearing, 1/9/25, at 25-27. Although Foster Mother testified that R.P. was hoping to be accepted by a fourth Lifesharing provider, that process was still underway at the time of the hearing. **See id.** at 28-29. Foster Mother further explained that R.P.'s eligibility for Lifesharing was tied to his

_____

[9] Foster Mother testified that the first prospective Lifesharing provider, Merakey, had requested that she make significant alterations to her home in order to help R.P. qualify for the program. **See** N.T., 1/9/25, at 25. Specifically, Foster Mother averred that she removed security bars from her windows, installed carpeting, replaced her home's entire "heating system," and renovated the bathrooms. **Id.** Despite these significant expenditures incurred by Foster Mother, Merakey denied R.P.'s application for reasons that are unclear from the certified record. **See id.**

entitlement to SSI, which was also unresolved at the time of the hearing. ***See id.*** Finally, Foster Mother affirmed that she would be financially unable to care for R.P. without clarity regarding these issues and entitlements. ***See id.*** at 31-33.

Along similar lines, Case Manager Miles averred that CPA struggled to connect R.P. with service providers. ***See id.*** at 6. In particular, she stated that CPA was trying to assist R.P. in obtaining an IDS waiver for in-home services. ***See id.*** at 10. Case Manager Miles testified, however, that R.P.'s eligibility for the IDS waiver was still not established at the time of the proceedings. ***See id.*** at 17-18. She also corroborated that Foster Mother was not willing or able to continue caring for R.P. without assistance from resource providers. ***See id.*** at 17. Additionally, the permanency review orders generally reflected uncertainty regarding R.P.'s educational and professional plans.

Viewed collectively, the record evidence demonstrates that the many moving pieces of R.P.'s post-discharge needs were not yet finalized at the time the court issued the discharge order, in violation of our Supreme Court's rules. ***See*** Pa.R.J.C.P. 1631(a)(10), (e)(3)-(4), (f). The court also erroneously relied upon a mistaken belief that Foster Mother would continue housing and supporting R.P. despite the uncertainty regarding his future entitlements to services, income, and housing support. ***See*** Order for Termination of Court Supervision, 1/9/25, at 1-2. This unsupported finding wholly mischaracterized the testimonies of Case Manager Miles and Foster Mother. ***See*** N.T.

Dependency Hearing, 1/9/25, at 17, 31-32. Moreover, this error exacerbated the significant issues posed by the lack of finalized transitional planning by potentially forcing Foster Mother to remove R.P. from her home despite R.P. being without any further transition resources, which would, effectively, leave R.P. homeless. Plainly, it was imperative that the court ensure that R.P.'s transition plan sufficiently addressed the factors set forth at Rule 1631(e)(2) prior to terminating its supervision of R.P.'s case. ***See*** Pa.R.J.C.P. 1631(a)(10), (e)(3)-(4), (f). In the absence of any record indication that these requirements were fulfilled, we conclude that the trial court erred in terminating supervision of R.P.'s case. ***See id.***

Moreover, we find no merit in the court's suggestion that it lacked jurisdiction to take further action due to R.P. reaching the age of twenty-one. We recognize, of course, that the commentary to Rule 1631 advises that "[i]n no case is a juvenile over 21 to remain under juvenile court supervision." Pa.R.J.C.P. 1631 cmt.; ***see also*** Pa.R.J.C.P. 1635(E)(2) ("In no event shall a child remain under juvenile court supervision once the child has turned twenty-one years of age."). We do not, however, interpret these admonitions as permitting the trial court to abdicate its obligations by simply allowing time to expire. ***See, e.g.***, Pa.R.J.A. 109(b) (establishing presumption that "The Supreme Court intends a rule to be construed to secure the just, speedy, and inexpensive determination of every action or proceeding to which it is applicable."). We emphasize that while the commentary to Rule 1631 and the text of Rule 1635(E)(2) arguably prescribe the timeframe in which court

supervision should conclude, it does not ascribe specific consequences for a court's failure to abide by that standard.[10] *See id.*

In any event, in giving effect to every portion of the text of Rule 1631, as we must, *see* Pa.R.J.A. 108(b), we find that Rule 1631(e)(4) requires that supervision may not be terminated without presentment of an appropriate termination plan, *see* Pa.R.J.C.P. 1631(e)(4), and we conclude that courts enjoy original plenary authority to take appropriate action for the best interests of individuals that have been declared dependent until, at least, they reject an appropriate plan under the rules. *See J.M.*, 219 A.3d at 658; *Griffin*, 690 A.2d at 1200; *see also* Pa.R.J.C.P. 1631(e)(4) ("The court **shall not** terminate its supervision of the child without approving an appropriate transition plan, unless the child, **after an appropriate transition plan has been offered**, is unwilling to consent to the supervision and the court determines termination is warranted.") (emphasis added). We readily conclude that the court's jurisdictional authority extends to permit it to ensure that its supervision of the case is terminated in a manner consistent with Rule 1631. *See* Pa.R.J.C.P. 1631(e)(3)-(4), (f).

_____

[10] In several persuasive writings, this Court has opined that rules-based time limits may not be an appropriate basis for relief if no consequences are established for noncompliance. *See, e.g.*, *Heffley v. Heffley*, 318 A.3d 1290, at *8 (Pa. Super. 2024) (Table) (declining to grant relief for violation of time limits within the Pennsylvania Rules of Civil Procedure when the provisions cited provided no "remedy" or "sanction" for noncompliance) (citing *E.B. v. M.B.*, 304 A.3d 754, at *6 (Pa. Super. 2023) (Table) (same)); *see also Dear v. Dear*, 326 A.3d 433, at *6 (Pa. Super. 2024) (Table) (same).

Furthermore, we believe that this holding dovetails with our Supreme Court's stated intent concerning the objectives to be achieved in terminating dependency oversight of individuals over the age of eighteen. **See** Pa.R.J.A. 108(a) ("The object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court."). Although there is scant case law discussing the specific considerations at play in the instant case, the Supreme Court's Office of Children & Families in the Courts ("OCFC") has promulgated persuasive guidance regarding the issues surrounding, *inter alia*, termination of dependency proceedings through the Pennsylvania Dependency Benchbook ("the Benchbook").[11] **See generally** Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook (4th ed. 2024).

In general, the Benchbook provides that "termination of court supervision is permissible only when permanency for the child has occurred and court-ordered services from the county agency are no longer warranted[.]" **Id.** at § 15.2. It further advises: "In those few instances where youth turn 18 years of age without a permanent family, the judge or

_____

[11] In the foreword to the Benchbook, Justice Kevin M. Dougherty advises that "while the Benchbook is not binding authority, it is persuasive and has been mentioned in several Superior and Supreme Court opinions." Our review of Pennsylvania precedent confirms as much. **See In re Adoption of C.M.**, 255 A.3d 343, 362 (Pa. 2021); **In re D.C.D.**, 105 A.3d 662, 665 n.2, 675 (Pa. 2014); **In re T.S.M.**, 71 A.3d 251, 268, (Pa. 2013); **In re R.J.T.**, 9 A.3d 1179, 1191 n.14 (Pa. 2010); **Interest of K.C.**, 319 A.3d 596, 598 n.2 (Pa. Super. 2024); **Interest of K.M.**, 305 A.3d 116, 120-29 (Pa. Super. 2023); **In Interest of L.T.**, 158 A.3d 1266, 1277-79 (Pa. Super. 2017).

hearing officer should take extraordinary steps to ensure the youth is capable of self-care and support when considering termination of court supervision." *Id.* at § 15.4.1. The Benchbook reminds us that "[e]ach young person should be seen as a unique individual with unique needs. As such, no one plan or service is likely to be right for every youth. Instead, transition plans should be tailored to the specific needs, resources, and strengths of the individual youth." *Id.* Thus, an appropriate transition plan requires "detail and immediacy" that addresses a youth's needs with specificity. *Id.* To that end, the Benchbook also emphasizes that courts should, "at a minimum," tailor plans to address the elements enumerated by statute and the Rules of Juvenile Court Procedure. *Id*. (citing Pa.R.J.C.P. 1631(e)(2); 67 Pa.C.S. § 7505).

We perceive little, if any, daylight between our Supreme Court's policy directives contained within the Benchbook and the holding in the instant case. As set forth above, the trial court's failure to ensure the creation of an appropriate transition plan was error under both the letter and spirit of our law.[12]

_____

[12] This Court has also relied upon a similar publication from the Juvenile Law Center, which is a "distinguished child advocacy association." *In re S.H.*, 71 A.3d 973, 981 (Pa. Super. 2013). This publication—the Pennsylvania Judicial Deskbook—is also instructive regarding the issues raised by this case. *See id*.; *see also Interest of K.C.*, 310 A.34d 296, 304-05 (Pa. Super. 2023); *In Interest of R.C.*, 628 A.2d 893, 898 (Pa. Super. 1993).

This publication opines that, in the context of dependency, "[d]ischarge, like any disposition, should serve the youth's best interest and promote safety, permanency and well-being." Alisa G. Field & Nina W. Chernoff, *Pennsylvania*

*(Footnote Continued Next Page)*

Based upon the foregoing, we conclude that the court erred in terminating its supervision of R.P.'s case without approving an appropriate transition plan as required by Rule 1631.  Accordingly, we vacate the trial court's January 9, 2024 order and remand this matter for the preparation and court approval of an appropriate transition plan.  *See* Pa.R.J.C.P. 1631(e)(2)-(3).  Thereafter, the court may terminate its supervision of R.P. in accordance with Rule 1631(a)(10), (e)(4), and (f), or otherwise in accordance with law. *See* Pa.R.J.C.P. 1631(a)(10), (e)(4), (f).

Order vacated.  Case remanded with instructions.  Jurisdiction relinquished.

_____

*Judicial Deskbook: A Guide to Statutes, Judicial Decisions and Recommended Practices for Cases Involving Dependent Children in Pennsylvania* (4th ed. 2004) at 211.  Accordingly, it opines that courts "should require the county agency to present a discharge plan that covers all of the core areas" of concern, including education, employment, housing, health care, insurance coverage, social connections, and competencies in daily living skills. *Id.* It further advises that courts should "not accept a plan that simply states where the youth will be living" and should also "reject discharge plans which do nothing more than refer youth to homeless shelters or county public assistance offices, since these 'plans' on their face do not fulfill the permanency goal of independence and self-sufficiency." *Id.* Overall, the Deskbook urges courts to "scrutinize the efforts being made to help a youth achieve independence in the same manner that it reviews efforts made to reunify youth with their families or find adoptive homes." *Id.* at 206.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/29/2025